Opinion by Judge PAEZ; Concurrence by Judge PREGERSON; Concurrence by Judge O’SCANNLAIN.
OPINION
PAEZ, Circuit Judge:
■ In this case we address the extent to which a police officer retains First Amendment protection when- he discloses his fellow officers’ misconduct. Angelo Dahlia, a detective in the Burbank Police Department (“BPD”), brought this 42 U.S.C. § 1983 First Amendment retaliation suit against the City of Burbank, the Chief of Police and several other police officers. The district court granted the defendants’ motions to dismiss the § 1983 cause of action for failure to state a claim. Fed. R.Civ.P. 12(b)(6). The court reasonéd that, under Huppert v. City of Pittsburg, 574 F.3d 696 (9th Cir.2009), Dahlia’s disclosure to the Los Angeles Sheriffs Department ' (“LASD”) of his fellow officers’ misconduct was not subject to First Amendment protection because he had a professional duty, as a matter of California case law, to report misconduct. The district court also held that Dahlia’s placement on administrative leave did not constitute an “adverse employment action.”
We reverse the district court on both grounds and overrule Huppert. We hold that (1) after Garcetti v. Ceballos, 547 U.S. 410, 424, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), courts must make a “practical” inquiry when determining the scope of a government employee’s professional duties and that Huppert erred in concluding that California broadly defines police officers’ duties as a matter of law for the purpose of First Amendment retaliation analysis; and (2) placement on administrative leave can constitute an adverse employment action. We further hold that, on remand, Dahlia may renew his request for leave to amend his complaint to allege more explicitly which acts are protected by the First Amendment and which acts constitute adverse employment actions.
I. FACTUAL AND PROCEDURAL BACKGROUND
A.[1]
Following an armed robbery on December 28, 2007, at Porto’s Bakery & Café in Burbank, California, Dahlia was assigned to assist in the robbery investigation, which was supervised by defendant Lieutenant Jon Murphy. The day after the robbery, Dahlia observed defendant Lieutenant Omar Rodriguez grab a suspect by the throat with his ‘left hand, retrieve his handgun from its holster with his right hand, and place the barrel of the gun under the suspect’s eye, saying, “How does it feel to have a gun in your face motherfucker.” Rodriguez noticed Dahlia looking on in disbelief. Later that same evening, Dahlia heard yelling and the sound of *1064 someone being hit and slapped from inside a room where defendant Sergeant Edgar Peñaranda was interviewing another suspect.[2]
Dahlia was subsequently, excluded from participating in suspect interviews, .and high-ranking officers within BPD essentially took control of the investigation. Witnesses and suspects continued to be physically assaulted and beaten in BPD’s interview rooms, while officers prevented anyone from walking past the rooms or into the audio room. Dahlia met with Murphy to disclose the abuse that he had witnessed. Dahlia told Murphy that the interviews were getting too physical and that Dahlia was having difficulty maintaining order in the investigation. Murphy responded by telling Dahlia to “stop his sniveling.”
The physical beatings continued in BPD interview rooms and in the field, evidenced by the booking photos of various suspects. At one point, Chief of Police Stehr appeared at a briefing and, upon learning that not all of the robbery suspects were in custody, said, “Well then beat another one until they are all in custody.”
After witnessing the misconduct and abuse, Dahlia approached Murphy a second time and pleaded that he did not have control over the case. Murphy became upset and told Dahlia that he “didn’t want to hear this shit again” and that he was “tired of all the B.S.” In January 2008, Dahlia and another detective met with Murphy a third time, telling him that “the beatings have to stop” and “the madness ha[s] to stop.” Murphy did nothing to respond to these complaints and the abusive tactics continued.
In April 2008 officers learned that BPD’s Internal Affairs (“IA”) unit was planning to investigate the unlawful physical abuse and the other illegal procedures relating to the Porto’s robbery investigation. Around the same time, Rodriguez began going out of his way to monitor Dahlia and ultimately threatened him not to say anything to IA. As the IA investigation grew nearer, Rodriguez and Peñaran-da contacted Dahlia on á daily basis, threatening him to keep quiet. Before the IA investigation commenced, Chief Stehr told, an IA lieutenant, “I put you in this position to make it go away.”
On April 29, 2008, Dahlia was interviewed for the first time by IA. Immediately after the interview, Rodriguez confronted Dahlia and demanded to know what Dahlia had said during the interview. Dahlia’s complaint is silent regarding what he actually said during the IA interview, though he told Rodriguez, out of fear, that he did not say anything to IA. When- asked by Peñaranda if he had disclosed anything to IA, Dahlia, out of fear for his safety, also told Peñaranda that he had not.
On May 8, 2008, IA interviewed Dahlia a second time. After the interview, Dahlia received a call from Rodriguez directing him to report to a park. Dahlia went to the park, believing that there was an incident occurring, but encountered only Rodriguez and another officer there. Rodriguez approached him aggressively and asked, “What the fuck did you tell them?” Rodriguez then asked, almost verbatim, the questions posed by IA and attempted to intimidate Dahlia into revealing his answers. Rodriguez, Peñaranda and another officer incessantly harassed, intimidated and threatened Dahlia over the following weeks, to the point where his working conditions were “fully consumed” by the intimidation.
*1065 On May 21, 2008, IA interviewed Dahlia a third time. Immediately after the interview, Rodriguez appeared and aggressively stared directly at Dahlia. The threats and intimidation continued during the subsequent months. Toward the end of 2008, Peñaranda and Murphy told Dahlia that a federal investigation into the Porto’s robbery might be forthcoming and warned Dahlia not to disclose anything to federal investigators. In January 2009, rumors circulated more widely that the FBI had been contacted about commencing an investigation. At some point, Murphy told Dahlia, “It’s on. The Feds are doing an investigation and heads are going to roll. Don’t say anything.” Peñaranda told Dahlia, “It’s gonna be bad. You can’t say anything.” Rodriguez also approached Dahlia and told him “not to talk to the feds.” The complaint alleges neither that the FBI actually commenced an investigation nor that Dahlia ever spoke to the FBI.
On April 2, 2009, Rodriguez called Dahlia into his office, told Dahlia to sit down, and closed the door and the blinds. Rodriguez then retrieved his gun from its holster, looked at Dahlia, and placed the gun in a drawer. At one point during the meeting, Rodriguez placed his hands on the desk and told Dahlia, “I’m not a fucking cheese eating rat” and then commented that he was not afraid of being suspended or fired. Rodriguez also leaned forward and said, “Fuck with me and I will put a ease on you, and put you in jail. I put all kinds of people in jail, especially anyone who fucks with me!” Dahlia reported this incident to the Burbank Police Officers’ Association president, who reported it to the Burbank City Manager.
On May 11, 2009, LASD interviewed Dahlia about the Porto’s robbery investigation. During the interview, Dahlia disclosed the defendants’ misconduct, threats, intimidation and harassment. Four days later, Dahlia was placed on administrative leave pending discipline.
Dahlia alleges that he was subjected to adverse employment actions as a result of his protected speech activities and that there was no legitimate justification for the adverse actions. In alleging a § 1988 violation, Dahlia claims that defendants’ retaliatory acts included, inter alia, threats, ostracism, denial of employment opportunities, undue scrutiny of work performance, denial of continued employment, and malicious statements calculated to destroy his reputation.
B.
Dahlia filed his § 1983 complaint in November 2009, alleging seven claims: (1) retaliation against a public employee for speech disclosing police misconduct, in violation of the First Amendment; (2) retaliation against a public employee for disclosing information to a government or law enforcement agency, in violation of California Labor Code section 1102.5; (3) retaliation against a public employee for making an oral or written complaint to a governmental agency, in violation of California Labor Code section 6310; (4) retaliation against a public employee for disclosing an abuse of authority or a substantial and specific danger to public health or safety, in violation of California Government Code section 53298; (5) a violation of the Bane Act, California Civil Code section 52.1(b), which prohibits interference with the exercise of constitutional rights; (6) intentional infliction of emotional distress; and (7) negligent infliction of emotional distress. Dahlia sued the City of Burbank, Police Chief Stehr, Lieutenants Murphy and Rodriguez, Sergeants Peñaranda and Jose Duran, and Detective Chris Canales.
Police Chief Stehr moved for summary judgment on several grounds, including qualified immunity. The district court de *1066 nied without prejudice, as premature, Stehr’s summary judgment motion because Dahlia had not yet had an adequate opportunity to conduct discovery. Stehr pursued an interlocutory appeal of the district court’s denial of his motion for summary judgment. The original three judge panel in this case reversed the denial of qualified immunity for Stehr in an unpublished memorandum disposition. Dahlia v. Stehr, 491 Fed.Appx. 799 (9th Cir.2012).
■ The remaining individual defendants moved, primarily 'relying on Huppert, to dismiss the case for failure to state a claim. Fed.R.Civ.P. 12(b)(6). Granting these motions, the district court determined that Dahlia’s § 1983 claim was barred because (1) he spoke pursuant to his official duties and thus was not constitutionally protected, and (2) placement on paid administrative leave .is not an adverse employment action. The district court accordingly dismissed Dahlia’s § .1983 claim with prejudice, and declined to exercise supplemental jurisdiction over Dahlia’s state law claims.
A panel of this court reluctantly affirmed on the ground that it was bound by Huppert v. City of Pittsburg to conclude that Dahlia spoke pursuant to his official duties. Dahlia v. Rodriguez, 689 F.3d 1094 (9th Cir.2012). In no uncertain terms, the panel stated that “[t]he reasoning in Huppert that professional duties can be determined as a matter of law is wrong, and the result that reports of police misconduct are not protected by the First Amendment is dangerous.” Id. at 1106-07. Contrary to the district court, the panel found that placement on administrative leave and the resulting consequences, “if proven, ... may very well constitute an adverse employment action.” Id. at 1107. Upon a majority vote of eligible judges, we granted rehearing en banc.
II. JURISDICTION AND STANDARD OF REVIEW
We have jurisdiction under 28 U.S.C. § 1291 to review the district court’s final judgment dismissing with prejudice Dahlia’s claims against Murphy, Peñaranda, Rodriguez and the City of Burbank.[3] We review de novo the district court’s dismissal of Dahlia’s complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Balistreri v. Pacifica Police Dep’t, 901 F.2d 696, 699 (9th Cir.1990). In undertaking this review, “we must accept all factual allegations of the complaint as true and draw all reasonable inferences in favor of the nonmoving party.” TwoRivers, 174 F.3d at 991. Dismissal under Rule 12(b)(6) is inappropriate unless Dahlia’s complaint fails to “state a claim to relief that is plausible on its face.” Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).
III. ANALYSIS
“It is well settled that the state may not abuse its position as employer to stifle ‘the First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of public interest.’ ” Eng v. Cooley, 552 F.3d 1062, 1070 (9th Cir.2009) (alteration in original) (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). Moreover, the public has a strong interest in hearing from public employees, especially because “[g]overnment employees are often in the best position to know what ails the agencies for which they work.” Waters v. Churchill, 511 U.S. 661, *1067 674, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). It may often be the case that, unless public employees are willing to blow the whistle, government corruption and abuse would persist undetected and undeterred.
In Pickering, the Supreme Court defined a balancing test for First Amendment retaliation cases involving public employees. The task for us is to seek “a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.” Pickering, 391 U.S. at 568, 88 S.Ct. 1731; see also Connick v. Myers, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The Court has recognized that “the First Amendment interests at stake extend beyond the individual speaker ... [because of] the importance of promoting the public’s interest in receiving the well-informed views of government employees engaging in civic discussion.” Garcetti, 547 U.S. at 419, 126 S.Ct. 1951. In the classic whistle-blower case the state has no legitimate interest in covering up corruption and physical abuse. As an inevitable result of the Court’s jurisprudence and sound public policy, the First Amendment generally protects public employee whistleblowers from employer retaliation.
But our inquiry does not end there. In unraveling the case law since Pickering, we have further refined the Court’s balancing test into a five-step inquiry. We ask:
(1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiffs protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.
Eng, 552 F.3d at 1070.[4]
In this case, we can easily answer the first question. Dahlia’s speech — reporting police abuse and the attempts to suppress its disclosure — is quintessentially a matter of public concern. See Connick, 461 U.S. at 148, 103 S.Ct. 1684 (noting that speech warrants protection when it “seek[s] to bring to light actual or potential wrongdoing or breach of public trust”); Thomas v. City of Beaverton, 379 F.3d 802, 809 (9th Cir.2004) (finding that “[unlawful conduct by a government employee or illegal activity within a government agency is a matter of public concern”); see also Jackler v. Byrne, 658 F.3d 225, 236 (2d Cir.2011) (noting that “ ‘[ejxposure of official misconduct, especially within the police department, is generally of great consequence to the public’ ” (quoting Branton v. City of Dallas, 272 F.3d 730, *1068 740 (5th Cir.2001))), cert. denied, — U.S. -, 132 S.Ct. 1634, 182 L.Ed.2d 233 (2012); Marable v. Nitchman, 511 F.3d 924, 932 (9th Cir.2007) (finding it “worth noting that an employee’s charge of high level corruption in a government agency has all of the hallmarks that we normally associate with constitutionally protected speech ... and criticisms of the government lie at or near the core of what the First Amendment aims to protect”).[5]
The district court, however, ruled that Dahlia’s § 1983 First Amendment claim was barred because it found that (1) as a matter of law, Dahlia could not establish that he spoke “in the capacity of a private citizen and not a public employee,” Eng, 552 F.3d at 1071; and (2) being placed on administrative leave does not constitute an adverse employment action for the purposes of the First Amendment. We disagree with both conclusions and analyze them in turn.
A. Speech as a Private Citizen
1.
In Garcetti the Supreme Court narrowed the First Amendment protections for public employees. 547 U.S. 410, 126 S.Ct. 1951. The Court added an additional requirement to the Pickering balancing test, holding that the First Amendment does not protect employee speech when that speech is “pursuant to ... official duties.” Id. at 421, 126 S.Ct. 1951. This requirement is captured by the second prong of our test set forth in Eng, 552 F.3d at 1070. Whether Dahlia’s speech is protected by the First Amendment is rooted in the Court’s analysis in Garcetti.
In Garcetti plaintiff Ceballos was a deputy district attorney for Los Angeles County assigned as a calendar deputy during the relevant period. 547 U.S. at 413, 126 S.Ct. 1951. A defense attorney contacted Ceballos and asked him to investigate inaccuracies in a critical police affidavit. Id. “According to Ceballos, it was not unusual for defense attorneys to ask calendar deputies to investigate aspects of pending cases.” Id. at 414, 126 S.Ct. 1951. After investigating the alleged inaccuracies, “Ceballos determined the affidavit contained serious misrepresentations,” which he reported to his supervisor. Id. He “followed up by preparing a disposition memorandum” and an additional memo to his supervisor. Id. After a heated meeting attended by Ceballos, his supervisor and the affiant, the supervisor decided to proceed with the prosecution. Id. Ceballos brought a § 1983 First Amendment retaliation claim challenging the imposition of adverse employment actions in the aftermath of these events. Id. at 415, 126 S.Ct. 1951.
In rejecting Ceballos’ claim, the Court held that, “when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.” Id. at 421, 126 S.Ct. 1951. The Court said that “[t]he controlling factor in Ceballos’ case is that his expressions were made pursuant to his duties as a calendar deputy.” Id. Importantly, the Court noted that “the parties in this case do not dispute that Ceballos wrote his disposition memo pur *1069 suant to his employment duties. We thus have no occasion to articulate a comprehensive framework for defining the scope of an employee’s duties in .cases where there is room for serious debate.”. Id. at 424, 126 S.Ct. 1951.[6]
The Court further explained that various easy heuristics are insufficient for determining whether an employee spoke pursuant to his professional duties. The Court said that it was “not dispositive” that “Ce-ballos expressed his views inside his office, rather than publicly.... Employees in some cases may receive First Amendment protection for expressions made at work.” Id. at 420, 126 S.Ct. 1951. It was also “nondispositive” that “[t]he memo concerned the subject matter of Ceballos’ employment. ... The First Amendment protects some expressions related to the speaker’s job.” Id. at 421, 126 S.Ct. 1951. Additionally, the Court rejected “the suggestion that employers can restrict employees” rights by creating excessively broad job descriptions. Id. at 424, 126 S.Ct. 1951. The Court concluded:
The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee’s written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee’s professional duties for First Amendment purposes.
Id. at 424-25, 126 S.Ct. 1951 (citation omitted).[7]
Three years after Garcetti, a panel of this court decided Huppert v. City of *1070 Pittsburg, another § 1983 First Amendment retaliation case. The Huppert majority affirmed the grant of summary judgment to the defendant, holding that California police officers acted pursuant to their official duties when they investigated and reported on corruption within the police department by (1) assisting the District Attorney as ordered, (2)- defying the police chiefs orders and continuing an investigation at the behest of an .immediate supervisor, (3) cooperating with the. FBI, and (4) testifying before a grand jury. 574 F.3d at 698-700, 703, 706-08.
Although the Huppert majority engaged in the requisite “practical” inquiry in determining that the officers acted pursuant to their official duties as to the first two speech acts, id. at 703-06,[8] it relied on a 1939 California court of appeal decision to conclude, as a matter of law, that an officer acted pursuant to his official duties in cooperating with the FBI and testifying before a grand jury, id. at 706-10 (relying on Christal v. Police Comm’n of City of San Francisco, 33 Cal.App.2d 564, 92 P.2d 416 (1939)).[9]
In relying on Christal’s sweeping description of a California police officer’s professional duties, the Huppert majority failed to heed Garcetti’s mandate that “the proper inquiry [to determine the scope of an employee’s professional duties] is a practical one.” Garcetti 547 U.S. at 424, 126 S.Ct. 1951. The Court’s stated reason for requiring such an inquiry is precisely because “employers [cannot] restrict employees’ rights by creating excessively broad job descriptions.” Id. Relying on a broad court-created job description applicable to every member of a profession operates to do just that. Moreover, even if .Christal’s formulation of California police officers’ duties remains generally accurate, “the listing of a given task in an employee’s written job description is neither necessary nor sufficient to demonstrate that conducting the task is within *1071 the scope of the employee’s professional duties for First Amendment purposes.” Id. at 425, 126 S.Ct. 1951.
Given the factual similarities here, the three judge panel in this case, although expressing disagreement with Huppert, concluded that it was bound by it. We overrule Huppert to the extent that it improperly relied on a generic job description and failed to conduct the “practical,” fact-specific inquiry required by Garcetti. In so holding, we reject the defendants’ argument that California police officers are unique for the purposes of First Amendment retaliation claims. See Kannisto v. City of San Francisco, 541 F.2d 841, 843 (9th Cir.1976) (noting in a § 1988 First Amendment retaliation case that “[t]he Supreme Court has made it clear that ‘policemen, like teachers and lawyers ... are not relegated to a watered-down version of constitutional rights.’ Garrity v. New Jersey, 385 U.S. 493, 500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967)”).
2.
We also reject Judge O’Scannlain’s — and the defendants’ — argument that Christal and its progeny are controlling here for the additional reason that the authority he cites is inapposite. Although Judge O’Scannlain’s concurrence does.not mention it, O’Scannlain Concurrence at 1086-88, Christal explicitly limited its holding to whether police officers who were being investigated for criminal activities could assert their Fifth Amendment right against self-incrimination and still remain police officers. 92 P.2d at 418-19 (“We are concerned here only with the result of the exercise of [the Fifth Amendment] privilege, by those holding the positions of police officers, in an investigation by which it was sought to determine whether such officers had been guilty of criminal activities in connection with their duties as police officers.”). Even were we to ignore its limited holding, Christal explicitly stated that officers have a “duty to disclose such facts to their superiors.” Id. at 419 (emphasis added). Therefore, even over-reading Christal’s dicta, and then applying it in clear violation of Garcetti would not resolve this case.
The thrust of Judge O’Scannlain’s argument — like that of the defendants — is that police officers are unique under California law for the purpose of First Amendment retaliation claims. This is true, he argues, because California police officers have a freestanding professional duty to disclose the unlawful conduct of others to their superiors as well as to outside law enforcement agencies. O’Scannlain Concurrence at 1086-88. Yet neither the case law nor the'statute on which'he relies supports this proposition.
Rather, the California cases cited by defendants — a subset of which Judge O’Scannlain relies on — stand for the unsurprising proposition that a public employee cannot, when ordered, refuse to comply with a lawful investigation and escape discipline for so doing. As the California courts have reiterated' even outside the policing context, “ ‘[a] public employee, of course, cannot be forced to give an answer which may tend to incriminate him, but he may be required to choose between disclosing information and losing his employment.’ ” Hingsbergen v. State Pers. Bd., 240 Cal.App.2d 914, 50 Cal.Rptr. 59, 64 (1966) (quoting Steinmetz v. Cal. State Bd. of Educ., 44 Cal.2d 816, 285 P.2d 617, 621-22 (1955) (en banc)). Hingsbergen, for example, was not a police officer, but an employee of the California Department of Motor Vehicles (“DMV”). Id. at 60. He was dismissed for “willful disobedience” because he refused to answer questions when he was ordered to cooperate in an investigation by the state attorney general’s office and the local district attorney into malfeasance within the DMV. Id. at 61. Indeed, as Hingsbergen indicates, any *1072 public employee may face discipline for stonewalling, against orders to comply, a properly conducted investigation into misconduct within his department. The California cases and statute cited by Judge O’Scannlain stand for nothing further.[10] See O’Scannlain Concurrence at 1086, 1091.
That an officer could be disciplined for failing to comply with an order only begs the question in Dahlia’s case. Here, the only allegations in the record are that Dahlia was ordered not to comply with an investigation.[11]
3.
Our case law since Garcetti provides further guidance. In Posey, we analyzed a § 1983 First Amendment retaliation claim brought by a high school security guard against the school district that was dismissed on summary judgment. Posey v. Lake Pend Oreille Sch. Dist. No. 84, 546 F.3d 1121, 1123 (9th Cir.2008). Considering the divergent views of other circuits, we concluded that “after Garcetti the inquiry into the protected status of speech presents a mixed question of fact and law, and specifically that the question of the scope and content of a plaintiffs job responsibilities is a question of fact.” Id. at 1130. Therefore we held that, “when there are genuine and material disputes as to the scope and content of the plaintiffs job responsibilities, the court must reserve judgment on [whether the plaintiffs speech was pursuant to his official duties] ... until after the fact-finding process.” Id. at 1131; see also Robinson v. York, 566 F.3d 817, 823-24 (9th Cir.2009) (holding that the “scope of [the plaintiffs] job duties is a question of fact”); Eng, 552 F.3d at 1071 (noting that “the question of *1073 the scope and content of a plaintiffs job responsibilities is a question of fact” (internal quotation- marks omitted)); Freitag v. Ayers, 468 F.3d 528, 546 (9th Cir.2006) (holding that determining the scope of professional duties requires “factual determinations”).[12]
In Posey, we then held that the district court erred in granting summary judgment to the school district. We reasoned that there was a genuine dispute as to whether Posey acted pursuant to his official duties when he expressed his concern about school security in a letter to district, administrators. Posey, 546 F.3d at 1124. The parties disputed whether Posey’s duties included writing such internal communications about school security. Id. at 1124-25 (noting that the district argued that providing “reports and information about security matters at the high school” was “an inherent part of his duties,” while Posey contended that “his role in student discipline did not extend beyond discrete tasks such as ensuring that the parking lot remained orderly at the end of the school day”).
In Freitag, defendant prison officials appealed a jury verdict in favor of a correctional officer rendered before Garcetti. Freitag, 468 F.3d at 532, 536.- Applying Garcetti to the § 1983 First Amendment retaliation claim, we held that Freitag acted pursuant to her professional duties When she made “internal reports of inmate sexual misconduct and documentation of the prison’s failure to respond.” Id. at 546. In contrast, we held that she “acted as a citizen” when she complained about the same circumstances in a letter to a state senator and to the state inspector general. Id. at 545. We found it “a closer, question” worthy of remand to the district court familiar with the trial, whether Frei-tag acted pursuant to her official duties when she sent a letter to the director of the state prison system. Id. at 546. We were “unsure whether prison guards are expected to air complaints regarding the conditions in their prisons all the way up to” the director of the state system. Id.
In more than a half-dozen cases since Freitag, we have planted additional guideposts for determining the scope of a plain *1074 tiffs professional duties for the purposes of the First Amendment. See, e.g., Ellins v. City of Sierra Madre, 710 F.3d 1049 (9th Cir.2013); Karl v. City of Mountlake Terrace, 678 F.3d 1062 (9th Cir.2012); Clairmont v. Sound Mental Health, 632 F.3d 1091 (9th Cir.2011); Anthoine, 605 F.3d 740; Robinson, 566 F.3d 817; Alaska v. EEOC, 564 F.3d 1062 (9th Cir.2009) (en banc); Eng, 552 F.3d 1062; Marable, 511 F.3d 924.
4.
Precisely because of the fact-intensive nature of the inquiry, no single formulation of factors can encompass the full set of inquiries relevant to determining the scope of a plaintiffs job duties. However, we find that existing case law and common sense dictate a few guiding principles relevant to the case before us.[13]
First, particularly in a highly hierarchical employment setting such as law enforcement, whether or not the employee confined his communications to his chain of command is a relevant, if not necessarily dispositive, factor in determining whether he spoke pursuant to his official duties. When a public employee communicates with individuals or entities outside of his chain of command, it is unlikely that he is speaking pursuant to his duties. See Frei-tag, 468 F.3d at 545-46 (holding that the correctional officer’s communications with a state senator and the inspector general were protected speech, but her internal reports were not); see also Karl, 678 F.3d at 1072; Clairmont, 632 F.3d at 1105-06; Alaska, 564 F.3d at 1070-71 (holding that the plaintiffs act of holding a press conference to protest sex discrimination in her office was protected speech because, inter alia, her “official duties didn’t require her to ... bring the alleged sexual harassment to the public’s attention”). Thus, we agree with the Fifth Circuit that, generally, “when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job,” Davis v. McKinney, 518 F.3d 304, 313 (5th Cir.2008), although “it is not ■ dispositive that a public employee’s statements are made internally,” id. at 313 n. 3. “If however a public employee takes his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen.” Id. at 313 (citing Freitag, 468 F.3d 528).[14]
Second, the subject matter of the communication is also of course highly rel *1075 evant to the ultimate determination whether the speech is protected by the First Amendment. See Handy-Clay, 695 F.3d at 540 (identifying as a relevant factor the speech’s “general subject matter” (internal quotation marks omitted)). When an employee prepares a routine report, pursuant to normal departmental procedure, about a particular incident or occurrence, the employee’s preparation of that report is typically within his job duties. See Garcetti 547 U.S. at 421, 126 S.Ct. 1951 (holding that a deputy district attorney’s preparation of a memorandum regarding the merits of a particular case was not First Amendment protected speech because preparation of such memoranda was a routine part of what he “was employed' to do”); Freitag, 468 F.3d at 546 (holding that a correctional officer’s “internal reports of inmate sexual misconduct” were not constitutionally protected speech). By contrast, if a public employee raises within the department broad concerns about corruption or systemic abuse, it is unlikely that such complaints can reasonably be classified as being within the job duties of an average public employee, except when the employee’s regular job duties involve investigating such conduct, e.g., when the employee works for Internal Affairs or another such watchdog unit.
Third, we conclude that when a public employee speaks in direct contravention to his supervisor’s orders, that speech may often fall outside of the speaker’s professional duties. Indeed, the fact that an employee is threatened or harassed by his superiors for engaging in a particular type of speech provides strong evidence that the act of speech was not, as a “practical” matter, within the employee’s job duties notwithstanding any suggestions to the contrary in the employee’s formal job description. Garcetti 547 U.S. at 424-25, 126 S.Ct. 1951 (“Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee’s written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee’s professional duties for First Amendment purposes.”). We note that our sister circuits have disagreed with one another on this point. Compare Jackler, 658 F.3d at 241-42 (holding that a police officer was entitled to First Amendment protection when' he filed a truthful affidavit pursuant to his job duties and later refused the police chiefs pressure to substitute a false affidavit, concluding that the First Amendment protected his refusal to comply with the illegal orders), with Bowie v. Maddox, 653 F.3d 45, 48 (D.C.Cir.) (concluding that Jackler was wrongly decided because, despite the police chiefs illegal order, “the illegality of a government employer’s order does not necessarily mean the employee has a cause of action under the First Amendment when he contravenes that order”), denying reh’g to 642 F.3d 1122 (D.C.Cir.2011). As in Jackler, we think that it is relevant to the resolution of Dahlia’s case that Dahlia disclosed misconduct to LASD in contravention of the numerous threats and admonitions from his superiors not to reveal the misconduct to anyone. Even assuming ar-guendo that Dahlia might normally be required to disclose misconduct pursuant to his job duties, here he defied, rather than followed, his supervisors’ orders. As part of a “practical” inquiry, a trier of fact must consider what Dahlia was actually told to do. See Garcetti 547 U.S. at 424-25, 126 *1076 S.Ct. 1951; see also Robinson, 566 F.3d at 820-21, 823-24 (finding that we lacked jurisdiction where the district court found that there were genuine factual issues “regarding whether the scope of Robinson’s duties included reporting police misconduct” when Robinson, a police officer, filed multiple misconduct reports and testified to the same effect despite his superiors’ suggestions that he not do so).[15]
These principles serve as a necessary-guide to analyzing the fact-intensive inquiry mandated by Garcetti
5.
,We next apply these principles to Dahlia. Although the district court focused exclusively on Dahlia’s disclosure to LASD, Dahlia alleged several independent acts that could potentially be subject to First Amendment protection. Because the district court granted a Rule 12(b)(6) motion to dismiss, our task is not to resolve any factual dispute, but merely to determine whether Dahlia’s allegations support a reasonable inference that he acted outside of his professional duties in each instance.[16] At the motion to dismiss stage, we take Dahlia’s well-pleaded factual allegations as true. On remand, the parties will have an opportunity to conduct discovery as to Dahlia’s professional duties. Nonetheless, it is within our wheelhouse to reject, as implausible, allegations that are too speculative to warrant further factual development. Twombly, 550 U.S. at 570, 127 S.Ct. 1955.[17]
a.
Dahlia initially disclosed the misconduct that he had observed to defendant Lieutenant Murphy, the officer in charge of the Porto’s robbery investigation, who told him to “stop his sniveling.” Dahlia alleged that he met with Murphy two additional times .regarding the misconduct, pleading that “the beatings have to stop.” Even construing the facts and drawing all inferences in Dahlia’s favor, the only reasonable conclusion is that Dahlia acted pursuant to his job duties when he — as a detective investigating the Porto’s robbery and prior to receiving any threats or orders to the contrary — reported up the chain of command to the supervising lieutenant overseeing the investigation about abuse related to that same investigation.[18] That Murphy appears to have ignored Dahlia’s initial report does not convert into protected speech Dahlia’s later reports to the same supervisor. See Freitag, 468 F.3d at 545-46.[19]
*1077 b.
Dahlia subsequently met with BPD’s Internal Affairs officers three times. He alleged that he was harassed and threatened not to report any misconduct in anticipation of and following each meeting. Conspicuously, Dahlia does not allege that he actually disclosed any misconduct during his interviews with IA.
In meeting with the IA officers, Dahlia does not allege that he acted in contravention of his supervisors’ orders. Dahlia does not allege that anyone ever instructed him not to meet with IA, but only that supervisors threatened him not to say anything when interviewed. Because Dahlia appears to have done precisely what his superiors wanted him to do—that is, meet with IA but stay mum—we cannot say that Dahlia acted in contravention of their orders.
Nonetheless, Dahlia may very well have acted outside his chain of command when he met with IA. Although Dahlia did not explicitly allege that he acted outside his professional duties when he met with IA, this is not dispositive because we must draw all reasonable inferences in his favor. It is possible that Dahlia’s professional duties required him to meet with IA at IA’s insistence, but it is also plausible that Dahlia’s act of meeting with IA was outside his job duties for the purpose of the First Amendment. At this stage of the proceedings, where, as here, there is no allegation regarding a BPD officer’s duties with respect to meeting and cooperating with IA, we must resolve the ambiguity in Dahlia’s favor. Drawing this inference in Dahlia’s favor, we conclude that Dahlia has adequately alleged that his meetings with IA are protected by the First Amendment.
c.
After word had spread that the FBI might be investigating BPD, Rodriguez allegedly called Dahlia into his office and threatened to “put a case on” him and put him “in jail.” Dahlia alleged that he reported this incident to the Burbank Police Officers’ Association president, who in turn reported it to the city manager.[20] As with his other acts, Dahlia does not specifically allege that he acted outside his job duties when he reported the incident, nor that the retaliation he faced was directly caused by this act of reporting. Nonetheless, guided by the principles articulated above and drawing all reasonable inferences in Dahlia’s favor, we conclude that Dahlia’s report to his police union constituted protected speech. At this stage in the proceedings, it is reasonable to infer that Dahlia did not have a duty to report threats to his union, which constitutes a separate entity from BPD.
d.
Ultimately, Dahlia disclosed the defendants’ misconduct, threats, and harassment to LASD when interviewed about the Porto’s robbery investigation.[21] In doing so, Dahlia clearly spoke outside the chain of command and, indeed, to an outside agency altogether. Whether Dahlia ultimately acted pursuant to his job *1078 duties when he disclosed misconduct to LASD may well turn on whether discovery reveals that Dahlia’s supervisors instructed him to meet with and disclose information to LASD or in fact Dahlia did so of his own volition. Construing the complaint in Dahlia’s favor, his disclosure to LASD is protected by the First.Amendment.
B. Adverse Employment Action
The district court dismissed Dahlia’s suit on the alternative ground that placement on administrative leave is not an adverse employment action. We disagree. We conclude that, under some circumstances, placement on administrative leave can constitute an adverse employment action.[22] Moreover, we conclude that Dahlia sufficiently alleged additional acts that could also constitute adverse employment actions.[23]
“To constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind. Nor does it matter whether an act of retaliation is in the form of the removal of a benefit or the imposition of a burden.” Coszalter v. City of Salem, 320 F.3d 968, 975 (9th Cir.2003). In Coszalter, we said that, in First Amendment retaliation cases, “[t]he goal is to prevent, or redress, actions by a government employer that ‘chill the exercise of protected’ First Amendment rights.” Id. at 974-75 (quoting Rutan v. Republican Party of Ill., 497 U.S. 62, 73, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)). Therefore, we held that the proper inquiry is whether the action is “reasonably likely to deter employees from engaging in protected activity.” Id. at 976 (internal quotation marks omitted); see also id. (holding that “if the plaintiffs in this case can establish that the actions taken by the defendants were ‘reasonably likely to deter [them] from engaging in protected activity [under the First Amendment],’ they will have established a valid claim under § 1983” (alterations in original)).
We have not previously decided whether placement on administrative leave constitutes an adverse employment action. See Lakeside-Scott v. Multnomah, 556 F.3d 797, 803 n. 7 (9th Cir.2009) (noting that “being placed on administrative leave might qualify as an adverse employment action” but declining to reach the issue because it had not been properly pre *1079 served for appeal). Dahlia’s assertions— that administrative leave prevented him from taking the sergeant’s exam, required him to forfeit on-call and holiday pay, and prevented him from furthering his investigative experience — if proved, would constitute an adverse employment action. The inability to take a promotional exam, loss of pay and opportunities for investigative experience, as well as the general stigma resulting from placement on administrative leave appear “reasonably likely to deter employees from engaging in protected activity.” Coszalter, 320 F.3d at 976.
Dahlia made other allegations of conduct that may also constitute an adverse employment action. “Various kinds of employment actions may have an impermissible chilling effect. Depending on the' circumstances, even minor acts of retaliation can infringe on an employee’s First Amendment rights.” Id. at 975. Dahlia alleged that Rodriguez threatened to “put a case” on him and to put him “in jail.” These threats, if true, were made with the specific purpose of chilling Dahlia’s speech, and they appear “reasonably likely to deter” employees from speaking about misconduct observed within the BPD. Indeed, if it is true that Dahlia did not disclose what he knew when interviewed by IA, the chilling effect was in fact achieved, albeit for a limited time. The same might be said of Rodriguez’s alleged stunt in the park — calling Dahlia to the scene of a purported crime only to confront him with another officer and threaten him to stay silent. With further factual development, the same might also be true of the ongoing harassment and threats that Dahlia suffered from Rodriguez, Pe-ñaranda and other officers.
We note that in the Title VII context— from which the Coszalter standard is derived — courts have found that far less serious actions were sufficient to deter a reasonable employee from engaging in protected speech. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 70-71, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (concluding that a change in work assignment within the same job description would have deterred a reasonable employee from making a charge of discrimination); Brooks v. City of San Mateo, 229 F.3d 917, 928-29 (9th Cir.2000) (noting that “termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion” constitute adverse employment actions, whereas “declining to hold a job open for an employee and badmouthing an employee outside the job reference context” do not). Threats to put someone in jail or that cause an employee to fear for his own safety easily exceed the “reasonably likely to deter” standard. Construing the allegations in the light most favorable to Dahlia, we conclude that he has sufficiently stated that he suffered adverse employment actions.[24]
*1080 IV. CONCLUSION
We overrule Huppert v. City of Pitts-burg and hold that Dahlia has sufficiently stated a claim pursuant to 42 U.S.C. § 1983, namely that he was retaliated against for his protected speech. We remand to the district court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.

. The following factual background is drawn from the allegations of Dahlia’s complaint. Because Dahlia's complaint was dismissed under Federal Rule of Civil Procedure 12(b)(6), we take his factual allegations as true for the purposes of our review. TwoRivers v. Lewis, 174 F.3d 987, 991 (9th Cir.1999).

. Murphy, Rodriguez and Peñaranda were all high-ranking supervisors who outranked Dahlia.

. Prior to en banc oral argument, Dahlia dismissed his appeal against the other named defendants, Canales and Duran.

. We have sometimes described the Eng steps as "sequential." See, e.g., Johnson, 658 F.3d at 961; Robinson, 566 F.3d at 822; Eng, 552 F.3d at 1070. We now clarify that, by "sequential,” we mean only that all the factors are necessary, in the sense that failure to meet any one of them is fatal to the plaintiff's case. See, e.g., Desrochers v. City of San Bernardino, 572 F.3d 703, 709-19 (9th Cir.2009) (holding that plaintiffs could not show their speech covered a matter of public concern, and therefore could not state a First Amendment retaliation claim, without addressing the other Eng steps). That all five factors are necessary does not mean that courts must always go through the steps in the same order that they are listed in Eng. To the contrary, precisely because all five factors are independently necessary, it may be more efficient in some instances to answer a potentially dispos-itive question further down the Eng list first.

. In addressing the “public concern” prong of Eng, we clarified that “[i]t is not determinative that [a plaintiff] did not air his concerns publicly.” Anthoine v. N. Cent. Cntys. Consortium, 605 F.3d 740, 749 (9th Cir.2010); see also Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410. 415-16. 99 S.Ct. 693. 58 L.Ed.2d 619 (1979) (noting that "[n]either the [First] Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public”).

. Although it was not essential to finding that Ceballos acted pursuant to his professional duties in preparing the memorandum to his supervisor, the Court offered further explanation:
[T]he fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case [] distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline.... Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do.... Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was. paid to perform, Ceballos acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance.
Garcetti, 547 U.S. at 421-22, 126 S.Ct. 1951 (paragraph breaks omitted).

. Judge O’Scannlain's concurrence suggests that there should be a "bright line” between citizen-speech and employee-speech. O’Scannlain Concurrence at 1084-85, id. at 1084 n. 2 (noting that "[t]he dissenters in Garcetti, as well as the academic literature since, recognize the bright-line nature of the inquiry”). We do not take issue with the straight-forward proposition that Garcetti altered the Pickering balancing approach by recognizing that once a plaintiff's speech is classified as having been made pursuant to an employee's official duties, then such speech is categorically denied First Amendment protection. See O'Scannlain Concurrence at 1084 n. 2 and citations therein. However, this bright-line rule only begs the question of whether a plaintiff actually spoke pursuant to his. official duties. It is that inquiry that is before us here, and Garcetti explicitly said that there is no bright line rule for making that determination. As Judge O’Scannlain quotes: " 'Employees in some 'cases may receive First Amendment protection for expressions made at work.' " O'Scannlain Concurrence at 1085 (quoting Garcetti, 547 U.S. at 420, 126 S.Ct. 1951 (emphasis in O’Scannlain Concurrence)). Indeed, in the only portion of the opinion dealing with how to define the scope of an employee’s job duties, the Garcetti Court exclusively pointed to non-dispositive factors. 547 U.S. at 424-25, 126 S.Ct. 1951.

. As to the first issue in Huppert, the majority considered the factual record and determined that the undisputed facts (including an admission by the plaintiff, Huppert) enabled it to conclude as a matter of law that Huppert assisted the District Attorney pursuant to his professional duties. 574 F.3d at 703-06.
As to the second issue, although the dissent disagreed, the majority similarly concluded that, based on the undisputed facts, the plaintiff officers investigated corruption and prepared a report for the police chief and the city manager pursuant to their professional duties. Id. at 706; id. at 720 (W. Fletcher, J., dissenting). In concluding that there .Was a disputed question of fact as to the scope of the plaintiffs’ duties, the dissent pointed out that the police chief had instructed the plaintiffs to cease their investigation whereas the plaintiffs' direct supervisor had instructed the opposite. Id. at 720 (W. Fletcher, J., dissenting). We hold, infra, that in determining the scope of a plaintiff's job duties, a fact-finder should consider the instructions given to a plaintiff by his superiors. To the extent that Huppert can be read .to preclude this consideration, we overrule it.

. The full passage from Christal relied upon by the Huppert majority reads like a civics textbook:
"The duties of police officers are many and varied. Such officers are the guardians of the peace and security of the community, and the efficiency of our whole system, designed for the purpose of maintaining law and order, depends upon the extent to which such officers perform their duties and are faithful to the trust reposed in them. Among the duties of police officers are those of preventing the commission of crime, of assisting in its detection, and of disclosing all information known to them which may lead to the apprehension and punishment of those who have transgressed our laws. When police officers acquire knowledge of facts which will tend to incriminate any person, it is their duty to disclose such facts to their superiors and to testify freely concerning such facts when called upon to do so before any duly constituted court or grand jury. It is for the performance of these duties that police officers are commissioned and paid by the community.” Huppert, 574 F.3d at 707 (quoting Christal, 92 P.2d at 419).

. California Government Code section 3304(a) provides in part:
Nothing in this section shall preclude a head of an agency from ordering a public safety officer to cooperate with other agencies involved in criminal investigations. If an officer fails to comply with such an order, the agency may officially charge him or her with insubordination.
Cal. Gov’t Code § 3304. See Riverside Cnty. Sheriff’s Dep't v. Zigman, 169 Cal.App.4th 763, 87 Cal.Rptr.3d 358 (2008) (holding that a police officer could not invoke the marital privilege in an administrative investigation into her police officer husband’s theft and use of methamphetamine and avoid discipline pursuant to departmental policy); Alhambra Police Officers Ass'n v. City of Alhambra Police Dep’t, 113 Cal.App.4th 1413, 7 Cal.Rptr.3d 432, 438 (2003) (holding that California’s Public Safety Officers Procedural Bill of Rights Act did not permit a police union representative to “locate and remove documentary evidence pertaining to the misconduct investigation of another officer and then to return the evidence to the officer accused of misconduct — in admitted contravention of department rules and procedures”); Titus v. L.A. Cnty. Civil Serv. Comm'n, 130 Cal.App.3d 357, 181 Cal.Rptr. 699 (1982) (holding that a police officer who also acted as an attorney could not invoke the attorney-client privilege and impede an investigation by his police department into his client’s illegal activity and simultaneously avoid being sanctioned for doing so).

. The other California cases cited by Judge O'Scannlain arid the defendants, as in Chris-tal, invariably involve a police officer trying to avoid incriminating himself. That a police officer cannot hide from the law and simultaneously keep his badge does not imply that an officer has a freestanding professional duty to report the unlawful activity of others. See Szmaciarz v. Cal. State Pers. Bd., 79 Cal.App.3d 904, 145 Cal.Rptr. 396 (1978) (holding that a correctional officer was properly disciplined when he refused to answer questions or submit to a polygraph during an investigation into his rise and transport of marijuana into a prison); Fichera v. Cal. State Pers. Bd., 217 Cal.App.2d 613, 32 Cal.Rptr. 159 (1963) (holding that a state police officer was properly terminated for refusing to take a polygraph test in the investigation of an accusation against him); Frazee v. Civil Serv. Bd. of City of Oakland, 170 Cal.App.2d 333, 338 P.2d 943 (1959) (same as to a local police officer).

. As we recognized in Posey, our view that "the scope and content of a plaintiffs job responsibilities is a question of fact” is consistent with holdings of the Third, Seventh, and Eighth Circuits, but not with that of the Fifth, Tenth, and D.C. Circuits. 546 F.3d at 1128-30. We continue to adhere to our view and note that when an inquiry “is a mixed question of law and fact, ... it often will be inappropriate to take the question from the jury.” Harbor Tug & Barge Co. v. Papai, 520 U.S. 548, 554, 117 S.Ct. 1535, 137 L.Ed.2d 800 (1997).
Moreover, even several of the circuits that classify the inquiry into the scope of professional duties as a "question of law” nevertheless undertake a tailored, fact-specific assessment of a plaintiff's professional circumstances. See, e.g., Charles v. Grief, 522 F.3d 508, 512-14 (5th Cir.2008) (analyzing plaintiffs particular professional role and duties, even though the ultimate question of whether speech is entitled to protection is considered a legal question); Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1204-05 (10th Cir.2007) (analyzing the contents of teachers' contracts and parsing aspects of their speech to classify comments on, e.g., their school’s “expectations regarding student behavior” as unprotected speech and comments on, e.g., "staffing levels” at the school as protected speech); Wilburn v. Robinson, 480 F.3d 1140, 1150-51 (D.C.Cir.2007) (conducting factual inquiry into nature of plaintiff’s particular professional responsibilities). Since Posey, the Fourth Circuit reversed the dismissal under Rule 12(b)(6) of a police officer's § 1983 First Amendment retaliation claim because "thé question whether the [plaintiff's internal memorandum that he released to the press] ... was written as part of his official duties was a disputed issue of material fact.” Andrew v. Clark, 561 F.3d 261, 267 (4th Cir.2009).

. Other circuits have set forth illustrative lists of factors to consider when determining whether a given instance of speech falls within the scope of a plaintiff's job duties. See, e.g., Handy-Clay v. City of Memphis, 695 F.3d 531, 540-41 (6th Cir.2012) (identifying as factors: "the impetus for her speech, the setting of her speech, the speech’s audience, and its general subject matter”; "whether the statements were made to individuals up the chain of command”; "whether the content of the speech is nothing more than the quintessential- employee beef: management has acted incompetently”; "whether the speech was made inside or outside of the workplace and whether it concerned the subject-matter of the speaker’s employment” (internal quotation marks omitted)); Decotiis v. Whittemore, 635 F.3d 22, 32 (1st Cir.2011) (listing as "instructive” but not dispositive factors: "whether the speech was made up the chain of command; whether the employee spoke at her place of employment; whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it 'official significance’); whether the employee's speech derived from special knowledge obtained during the course of her employment; and whether there is a so-called citizen analogue to the speech” (citations omitted)).

. In its amicus brief, the Riverside Sheriffs' Association and Riverside Sheriffs’ Association Legal Defense Trust support this chain-of-command distinction. See Amicus Br. at 2 *1075 (arguing that "a police officer’s speech on a matter of important public concern[ ] should only fall outside the scope of First Amendment protection if it is made pursuant to his or her routine or core duties, within his or her chain of command, and in pursuit of his or her duty to report misconduct to a superior” (emphases added)).

. We decline to adopt as binding law a passing reference made by some of the Garcetti dissenters. O'Scannlain Concurrence at 1090 (quoting Garcetti, 547 U.S. at 433, 126 S.Ct. 1951 (Souter, J., dissenting)).

. As discussed supra, we find it evident that . Dahlia's speech addressed, in each instance, a matter of public concern.

. Were this case at the summary judgment stage and the undisputed facts enabled us to conclude whether Dahlia spoke pursuant to his job duties, then we could perform the "screening” role that Judge O’Scannlain exhorts us to play. O’Scannlain Concurrence at 1089. At the pleading stage, our role is more limited.

. By reporting to Murphy, a lieutenant, and not the sergeant leading the investigation, Pe-ñaranda, Dahlia likely skipped one level in the chain of command. This ambiguity is not sufficient to cast doubt on our conclusion here, where Dahlia specifically alleged that Murphy "oversaw the entire Porto’s robbery investigation,” and Peñaranda — -Dahlia’s direct supervisor — was the subject of Dahlia’s report.

. Judge Pregerson argues lucidly why the First Amendment should protect a police whistleblower who defies his superiors’ attempts to silence him. See generally Preger-son Concurrence. As we conclude, supra in III.A.4., when a public employee speaks in direct contravention to his supervisor's orders, that speech may often fall outside of the *1077 speaker’s professional duties. Here, however, Dahlia reported the misconduct to Murphy prior to being subjected to his superiors' threats and intimidation and therefore could not. have been acting in contravention of them.

. This is not merely an "employee beef: management has acted incompetently,” Handy-Clay, 695 F.3d at 540; rather, the alleged threat and attempt to stifle an investigation into police misconduct is clearly a matter of great public concern, see Thomas, 379 F.3d at 809.

. In his briefs on appeal, Dahlia also referenced disclosing information to the FBI, but there are no allegations in the complaint that Dahlia ever spoke with, let alone disclosed anything to, federal agents.

. The district court also found that Dahlia failed to allege that any of the individual defendants, other than Chief Stehr, caused him to be placed on administrative leave or to suffer any other adverse employment consequence. To the extent that the particular threats and harassment by Peñaranda and Rodriguez can constitute adverse employment actions, we disagree. Dahlia has alleged as clearly as possible, pointing to specific instances, that both defendants threatened and harassed him in an attempt to silence him. With respect to Dahlia's placement on administrative leave, on remand Dahlia may seek leave to amend his complaint to clarify his allegations. We note that " 'personal participation is not the only predicate for section 1983 liability. Anyone who "causes” any citizen to be subjected lo a constitutional deprivation is also liable.’ " Gilbrook v. City of Westminster, 177 F.3d 839, 854 (9th Cir.1999) (quoting Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir.1978)). The " 'requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.' ” Id. (quoting Johnson, 588 F.2d at 743-44).

. In his opposition to defendants' motions to dismiss, Dahlia requested leave to amend his complaint. In light of its ruling that Huppert controlled, the district court never addressed Dahlia's requests for leave to amend, apparently because any amendment would have been futile. On remand, in the event that Dahlia renews his request to amend his complaint, the district court should grant him leave to clarify his allegations.

. This step of the Eng test has a sub-element that is not at issue in this appeal: whether the plaintiff’s speech was a substantial or motivating factor in the adverse employment action. That issue was not raised in the briefs, and we do not reach it. See Butler v. Curry, 528 F.3d 624, 642 (9th Cir.2008). We note only that although much of the alleged harassment preceded Dahlia’s ultimate disclosure to LASD, such chronology does not necessarily weigh against a finding that the harassment was an adverse employment action meant to discourage Dahlia from reporting the misconduct to others. In other words, insofar as the harassment was intended to chill Dahlia’s protected speech, it may qualify as an adverse employment action. See, e.g., Allen v. Scribner, 812 F.2d 426, 434 n. 17 (9th Cir.) (noting in a First Amendment § 1983 retaliation case that a valid claim can be stated "[wjhere comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse ... action will follow the failure to accede to the official’s request [that the employee ■ curtail his first amendment rights]” (second alteration omitted in *1080 original) (internal quotation marks omitted)), amended, 828 F.2d 1445 (9th Cir.1987).