**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JANELL HOWARD,
*Plaintiff-Appellant*,

v.

CITY OF COOS BAY, an Oregon
Municipal Corporation; CRADDOCK
RODGER, in his individual capacity,
*Defendants-Appellees*.

No. 14-35506

D.C. No.
6:12-cv-01372-
MC

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael J. McShane, District Judge, Presiding

Argued and Submitted March 7, 2017
Portland, Oregon

Filed September 25, 2017

Before:  Diarmuid F. O'Scannlain, Raymond C. Fisher,
and Michelle T. Friedland, Circuit Judges.

Opinion by Judge O'Scannlain

**SUMMARY**[*]

---

**Civil Rights**

The panel affirmed the district court's summary judgment in an action brought under 42 U.S.C. § 1983 and Oregon state law by a former employee of the City of Coos Bay, Oregon, who alleged that the City violated the First Amendment and state law by refusing to rehire her as a Finance Director.

The City terminated plaintiff from her position as Finance Director in 2008. In 2009, she filed her first lawsuit against the City alleging that her termination was retaliatory *(Hunter I)*. While that lawsuit was pending, plaintiff's former position became vacant and she applied for the job. Her application was rejected in 2011. After a jury ruled in plaintiff's favor in *Howard I*, plaintiff filed a second action against the City in 2012, alleging that the City retaliated against her for her first lawsuit when it rejected her employment application (*Howard II*).

The panel first held that plaintiff's claims were not barred by claim preclusion because plaintiff's retaliation claim in the present suit arose from events that occurred after she filed her complaint in *Howard I* . The panel held that claim preclusion does not apply to claims that accrue after the filing of the operative complaint. The panel held, however, that issue preclusion barred plaintiff from recovering economic damages which she has already

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

received as a result of *Howard I* —namely the loss of the salary and benefits she could have earned as the City's Finance Director. Nevertheless, because plaintiff presented a new request for punitive damages and because she may have been able to demonstrate new non-economic damages, the panel considered the merits of her suit against the City.

The panel held that no reasonable jury could find that plaintiff's first suit was a substantial reason for the City's refusal to consider her for the Finance Director position in 2011. The panel held that rightly or wrongly, because of her previous termination in 2008, the City had demonstrated that it would have rejected plaintiff's application in 2011, irrespective of her suit.

The panel held that plaintiff's claim under the Oregon Whistleblower Act failed as a matter of law. Thus, the panel rejected plaintiff's assertion that the Act should be construed analogously to Title VII of the United States Code, and permit claims of retaliation brought by former employees.

**COUNSEL**

Beth Creighton (argued) and Michael E. Rose, Creighton & Rose PC, Portland, Oregon, for Plaintiff-Appellant.

Robert E. Franz, Jr. (argued), Law Office of Robert E. Franz, Jr., Springfield, Oregon, for Defendants-Appellees.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether the former employee of a City in Oregon may prevail on allegations that it violated the First Amendment and state law by refusing to rehire her.

I

A

Janell Howard served as the Finance Director for the City of Coos Bay ("City") from 1998 through 2008. On September 16, 2008, after an investigation into whether Howard had shoplifted from Wal-Mart (from which no charges were filed), she was terminated from such position for cause.

Howard maintained that her firing was actually the result of a complaint she had brought in June 2007 before the Oregon Board of Accountancy regarding an accountant whom the City had hired to conduct an audit. Howard believed that the accountant had billed the City for extra and unnecessary charges. The City Manager, Charles Freeman, requested that she withdraw the complaint, but Howard refused and was temporarily suspended in July 2007.

B

In September 2009, Howard filed suit ("*Howard I*") against the City and Freeman, alleging multiple claims, including First Amendment retaliation and whistleblower retaliation under Oregon law. Howard filed an amended complaint in October 2010.

Howard eventually found a new position as the Administrative Services Director for the City of Brookings, although it provided a lower salary with fewer benefits and caused Howard to have additional housing expenses.

In May 2011, while *Howard I* was pending, the City Finance Director position became vacant. The City appointed Susanne Baker, who at that time worked in the Finance Department, as acting Finance Director. Roger Craddock, then current City Manager, asked Baker if she would be interested in the position permanently, but she declined because she wanted to continue with her education. In June 2011, the City opened the application period to fill this position permanently, and Howard applied for the job on June 13.

On July 6, 2011, Howard received a letter from Craddock explaining that her application would not be considered because she previously had been terminated for cause.

The letter read:

> I am in receipt of your request to be considered for the open position of Finance Director with the City of Coos Bay. Unfortunately, as your prior employment with the City was terminated for cause, I am not in a position to consider you for the current position. I do wish you the best with your continued employment with the City of Brookings.

The application period for the Finance Director position closed on July 8, 2011. The City received a total of 29 applications, interviewed the top four applicants, but

declined to make an offer to anyone. Craddock again approached Baker about applying, but she again declined. The City began a second hiring period in August. Howard did not reapply, although under City policy, her prior application should have remained on file. The second application period closed on September 30, 2011. The City received twenty-three applications and interviewed the top three candidates. Again, the City declined to make any offers.

On October 25, 2011, Craddock again approached Baker about taking the Finance Director position permanently. She accepted the position the following day. The paperwork officially promoting her was not completed until November 7 or 8, 2011, but the promotion became effective on November 1.

Meanwhile, *Howard I* had been progressing to trial. On October 11, 2011, Howard submitted a trial witness list, which stated that Craddock would testify to the receipt of Howard's 2011 application for City Finance Director and subsequent rejection. Howard also filed a proposed exhibit list that included the July 6, 2011 rejection letter from Craddock.

Trial on Howard's First Amendment retaliation claim began on October 31, 2011. Howard moved to admit the July 2011 rejection letter into evidence on the "theory" that it demonstrated "continued retaliation for her protected speech." The City's attorney objected, arguing that this was "another claim . . . another set of circumstances" that was "outside the scope of this lawsuit." The court ruled that the letter was "still relevant with regard to damages."

The jury reached a verdict in favor of Howard on November 2, 2011. It awarded her $150,000 in economic

damages, $50,000 in non-economic damages, and it further awarded her $1,000 in punitive damages against Freeman, the former City Manager.

## C

On July 30, 2012, Howard filed this new suit ("*Howard II*") against the City of Coos Bay and City Manager Craddock, contending that the City retaliated against her success in *Howard I* by hiring Baker and rejecting her application to become City Finance Director. She brought claims under 28 U.S.C. § 1983, alleging that the City violated the First Amendment of the United States Constitution, and Or. Rev. Stat. § 659A.230, Oregon's whistleblower-protection law. The City and Craddock moved for summary judgment arguing that Howard's claims were barred by both claim and issue preclusion, and, alternatively, that they failed on the merits. The district court granted summary judgment on May 13, 2014, determining that Howard's claims were barred by claim and issue preclusion. Howard timely appealed.

## II

First, Howard argues that the district court erred by concluding that her claims were barred by claim preclusion.[1] Claim preclusion requires "(1) an identity of claims, (2) a

---

[1] We review summary judgment de novo, applying the same standard as the district court. *Szajer v. City of Los Angeles*, 632 F.3d 607, 610 (9th Cir. 2011). Thus, questions of claim and issue preclusion are reviewed de novo. *See United States v. Liquidators of European Fed. Credit Bank*, 630 F.3d 1139, 1144 (9th Cir. 2011). Summary judgment is appropriate if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

final judgment on the merits, and (3) privity between parties." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003) (quoting *Stratosphere Litig. L.L.C. v. Grand Casinos, Inc.*, 298 F.3d 1137, 1142 n.3 (9th Cir. 2002)).

The parties do not dispute the application of the second and third factors; the central debate is over the first factor—whether the claims between the two suits are identical.

## A

We employ four criteria to evaluate whether claims are identical:

> (1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts.

*Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (quoting *United States v. Liquidators of European Fed. Credit Bank*, 630 F.3d 1139, 1150 (9th Cir. 2011)). These criteria are not applied "mechanistically." *Garity v. APWU Nat'l Labor Org.*, 828 F.3d 848, 855 (9th Cir. 2016). "The fourth criterion is the most important." *Harris*, 682 F.3d at 1132.

## 1

Indeed, as did the district court, the parties focus on this fourth criterion—whether the suits involve the same

transactional nucleus of facts. "[T]he inquiry about the 'same transactional nucleus of facts' *is the same inquiry as* whether the claim could have been brought in the previous action." *Liquidators of European Fed. Credit Bank*, 630 F.3d at 1151. This is because:

> If the harm arose at the same time, then there was no reason why the plaintiff could not have brought the claim in the first action. The plaintiff simply could have added a claim to the complaint. If the harm arose from different facts at a different time, however, then the plaintiff could not have brought the claim in the first action.

*Id.* Thus, "[w]hether two suits arise out of the same transactional nucleus depends upon whether they are related to the same set of facts and whether they could conveniently be tried together." *Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 918 (9th Cir. 2012) (quoting *ProShipLine Inc. v. Aspen Infrastructures Ltd.*, 609 F.3d 960, 968 (9th Cir. 2010)).

To answer this question, a number of other circuits have "adopted a bright-line rule that *res judicata* does not apply to events post-dating the filing of the initial complaint." *Morgan v. Covington Twp.*, 648 F.3d 172, 177–78 (3d Cir. 2011); *see also Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 919 (2d Cir. 2010); *Smith v. Potter*, 513 F.3d 781, 783 (7th Cir. 2008); *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 529–30 (6th Cir. 2006); *Mitchell v. City of Moore*, 218 F.3d 1190, 1202 (10th Cir. 2000); *Manning v. City of Auburn*, 953 F.2d 1355, 1360 (11th Cir. 1992); *cf. Young-Henderson v. Spartanburg Area Mental Health Ctr.*, 945 F.2d 770, 774 (4th Cir. 1991) (suggesting without

deciding that res judicata need not "preclude claims that could not have been brought at the time the first complaint was filed"); 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4409 (3d ed. 2017) ("Most cases rule that an action need include only the portions of the claim due at the time of commencing that action, frequently observing that the opportunity to file a supplemental complaint is not an obligation."). Indeed, the Seventh Circuit has gone so far as to call it the "federal rule," *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 652 (7th Cir. 2011), and the Supreme Court spoke approvingly of this line of cases in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2305 (2016).

We have applied this rule in the context of California law, *L.A. Branch NAACP v. L.A. Unified Sch. Dist.*, 750 F.2d 731, 739 (9th Cir. 1984) (en banc),[2] and as an alternative holding in a footnote, *Cabrera v. City of Huntington Park*, 159 F.3d 374, 382 n.12 (9th Cir. 1998), but not expounded on it further. We now confirm that for purposes of federal common law, claim preclusion does not apply to claims that accrue after the filing of the operative complaint.

Absent such rule, we would be left with the more difficult question of whether the plaintiff could have amended her complaint in the midst of litigation to add claims which accrued after filing. Apart from amendments as a matter of course, which can occur only once, early in litigation, parties can amend their complaint before trial only with consent of opposing parties or leave of the district court. *See* Fed. R. Civ. P. 15(a). And only at the district court's

---

[2] We apply the res judicata rule of the jurisdiction that heard the initial case. *See Allen v. McCurry*, 449 U.S. 90, 96 (1980).

discretion are parties permitted to file a supplemental complaint. *See* Fed. R. Civ. P. 15(d).

Determining whether the district court or opposing parties might have permitted the plaintiff to amend her complaint in *Howard I* would require us to engage in the sort of analysis conducted by the district court—asking the extent to which discovery would have been disrupted if Howard had filed a supplemental pleading three months before trial. Such approach "would only invite disputes." *Morgan*, 648 F.3d at 178. Given the importance of "certainty and predictability," *id.*, we agree that a bright-line rule which asks only whether a claim could have been brought at the time the operative complaint in the prior suit was filed is appropriate.

2

Applying this rule, it is plain that the claims in *Howard I* and *Howard II* are not identical. Howard could not have brought retaliation claims in *Howard I* based on the City's refusal to consider her for the Finance Director position in 2011. Howard filed her initial complaint in *Howard I* on September 14, 2009, and she filed a second amended complaint on October 26, 2010. She had not yet applied for the Finance Director position at the time of her first or second amended complaints, let alone received the July 6, 2011 rejection letter.

Thus, Howard's retaliation claims in this suit arose from events that occurred after she filed her complaint in *Howard I*, and they are not barred by claim preclusion.

## III

Next, Howard maintains that the district court erred by determining that her requests for damages were barred by issue preclusion. The City argues that issue preclusion should prevent Howard from receiving damages, and thus effectively bar her claims.

Issue preclusion, or collateral estoppel, "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001)). The party asserting issue preclusion must demonstrate: "(1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." *Oyeniran v. Holder*, 672 F.3d 800, 806 (9th Cir. 2012).

The parties focus on the first prong—whether the issue is identical.

## A

Typically, we apply four factors (known as the Restatement factors) to evaluate the question:

(1) is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first?

(2) does the new evidence or argument involve the application of the same rule of law as that involved in the prior proceeding?

(3) could pretrial preparation and discovery related to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second?

(4) how closely related are the claims involved in the two proceedings?

*Resolution Tr. Corp. v. Keating*, 186 F.3d 1110, 1116 (9th Cir. 1999) (quoting *Kamilche Co. v. United States*, 53 F.3d 1059, 1062 (9th Cir. 1995)); *see also Restatement (Second) of Judgments* § 27 cmt. c (Am. Law Inst. 1982). Nonetheless, these factors are not applied mechanistically. *See, e.g.*, *Syverson v. Int'l Bus. Machs. Corp.*, 472 F.3d 1072, 1080–81 (9th Cir. 2007) (mentioning only three of the four factors); *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 953 (9th Cir. 2002) (evaluating whether the facts were identical without discussing the factors).

1

We begin with the first factor—whether there is "a substantial overlap between the evidence or argument to be advanced" in the two proceedings regarding damages. *Restatement (Second) of Judgments* § 27 cmt. c.

As the district court observed, there is no doubt that Howard has requested the same *type* of damages in both suits. In *Howard I*, she sought damages for "lost income, lost benefits and seniority, commuting and housing expenses," in

addition to "loss of future income and impairment of earning capacity," as well as "emotional distress, public humiliation, damage to her reputation, depression, loss of dignity and self esteem, anxiety, loss of companionship . . . and loss of enjoyment of life." In this suit, Howard is requesting "economic losses including but not limited to lost income, lost benefits and seniority, and housing expenses," in addition to "loss of future income and impairment of earning capacity," as well as "emotional distress." And in both suits, Howard requested punitive damages.

Nonetheless, merely asking for the same type of relief is not sufficient justification for issue preclusion. It is not at all surprising that the same types of claims—First Amendment retaliation and state whistleblower claims[3]—would produce the same types of damages. Asserting the same cause of action in two separate suits does not mean the underlying claims, which are based on different facts, are inherently identical. Likewise, requesting the same types of damages does not make two issues necessarily identical.[4] The more important question is whether Howard requested the same *scope* of damages. In other words, did Howard request damages covering the same factual losses in both suits?

In *Howard I*, Howard testified that as a result of her termination she had lost $33,522 in past wages and $12,699 in past benefits, and that she would lose $778,864 in future wages and $65,009 in future benefits (based on the

---

[3] In both suits, Howard brought First Amendment retaliation claims under 42 U.S.C. § 1983. In *Howard I*, she also brought a whistleblower claim under Or. Rev. Stat. § 659A.203, and in this suit she brings a whistleblower claim under Or. Rev. Stat. § 659A.230.

[4] Nonetheless, requesting the same types of damages may count in favor of the second and fourth Restatement factors. *See infra* Part III.A.2.

differences between her salary and benefits at the time of trial and her prior salary and benefits as the Finance Director for Coos Bay, carried forward until she was eligible for retirement in 2028). She testified that she had spent $736 in job search fees. Additionally, she spoke of the "emotional distress" she experienced as a result of being fired.

In evaluating damages, the court in *Howard I* instructed the jury that it should consider:

1) the mental and emotional pain and suffering experienced;

2) the reasonable value of wages or earnings lost to the present time; and

3) the reasonable value of wages or earnings which with reasonable probability will be lost in the future.

Thus, the City maintains that because Howard requested future damages and non-economic damages for the emotional distress resulting from "the fact that she no longer was working for the City" in *Howard I*, the issue of damages has already been decided. The City argues that Howard should be precluded from receiving a double recovery in this suit.[5]

---

[5] Although Howard requested future damages, the extent to which she received them is unclear. The jury returned a verdict that awarded $150,000 in economic damages, and $50,000 in non-economic damages against the City. But the jury did not specify the extent to which the $150,000 economic damage award was intended to cover future loss. If the jury credited all of Howard's alleged accrued salary losses of $46,221 ($33,522 in wages and $12,699 in benefits), then it would appear that she

Howard has not provided us with the damage computation she would request were this suit to continue to trial. But since she calculated her economic losses up to the time of her retirement in *Howard I,* presumably her projected economic losses of not being hired for the City Finance Director position in 2011 would be almost identical to the projected economic losses of being terminated in 2008, except that they would begin in 2011 and not 2008.

And, thus, because the scope of economic damages necessarily overlaps, the evidence supporting these damages must also overlap.[6] Again, while Howard has not directed us to the exact evidence she would use to support her request for economic damages in this suit, it seems certain that the evidence would be largely the same—testimony regarding the difference between the salary and benefits she would have enjoyed as Finance Director for the City of Coos Bay and her position as Administrative Services Director with the City of Brookings, for example.

---

received $103,779 for future losses ($150,000–$46,221). There is no way to know the precise amount, but it seems certain that at least some substantial portion of the $150,000 award was provided for future salary and benefit losses.

[6] The district court focused on the evidentiary overlap surrounding the July 2011 rejection letter, which was admitted for purposes of damages in *Howard I*, and forms the foundation of this suit. Nonetheless, while the letter was relevant to show Howard's ongoing economic damages in *Howard I*—continued difficulty in obtaining employment in Coos Bay—it says little about ongoing economic damages resulting from the City's refusal to hire her in 2011. In this suit the letter establishes the fact that the City rejected Howard's 2011 application—the cornerstone of her retaliation claims. Thus, although there is overlap, the letter serves a different function in each suit.

Thus, since the evidence and arguments supporting economic damages in both suits substantially overlap, the issue of economic damages is largely identical under the first Restatement factor.[7]

The same is not the case for non-economic and punitive damages. There is little doubt that Howard could argue that she suffered new emotional distress as a result of the 2011 rejection, apart from the emotional distress she suffered as a result of her 2008 termination. Nonetheless, since the July 2011 letter was admitted in *Howard I*, we agree with the district court that such letter could be used to demonstrate humiliation and embarrassment (and thus, support Howard's request for non-economic damages) in both suits. However, it is easy to imagine Howard presenting additional evidence of emotional distress resulting from the City's refusal to rehire her in 2011 that was not encompassed by the letter in *Howard I* (such as testimony regarding mental anxiety she experienced as a result of her rejection). Thus, while there may be some evidentiary overlap, it is insufficient to preclude all requests for non-economic damages.

More importantly, Howard's request for punitive damages in this suit is based on her claim that the City

---

[7] It may be possible that Howard could demonstrate new economic damages—for example, if she could show that her losses were more than projected in 2011. *But see* Restatement (Second) of Judgments § 25 cmt. c ("Accordingly, if a plaintiff who has recovered a judgment against a defendant in a certain amount becomes dissatisfied with his recovery and commences a second action to obtain increased damages, the court will hold him precluded; his claim has been merged in the judgment and may not be split."). We need not resolve the question here.

retaliated against her for filing *Howard I*.[8] Since this is a new alleged violation, the evidence and arguments supporting such relief (which are largely dependent on proof of the underlying claim) are distinct. There is no overlap.

Thus, the first Restatement factor favors a finding of identity of economic damages but not necessarily non-economic damages and certainly not punitive damages.

2

The other Restatement factors are less conclusive in making an identical issue determination. To the extent this suit includes new evidence and arguments, it involves the application of the same law of damages (factor two) as *Howard I* since Howard is bringing similar types of legal claims—retaliation in violation of the First Amendment and the Oregon whistleblower law (factor four). Yet, this is not particularly informative on the question of preclusion since neither party appears to have challenged the application of the legal rules governing damages (such as statutory damage caps) in either suit. *See Restatement (Second) of Judgments* § 27 cmt. c, illus. 6.

It seems unlikely that pretrial preparation in *Howard I* (factor three) could have been expected to embrace all of the issues in this suit since the alleged actions occurred during the midst of the discovery period in *Howard I*. Although the July 2011 letter was produced during *Howard I*, no one could have expected Howard to prepare for questions regarding the propriety of punitive damages for the

---

[8] In *Howard I*, the jury only considered punitive damages against former City Manager Freeman, who was not involved in the City's 2011 rejection of Howard's application.

retaliation she allegedly experienced for filing *Howard I*—since no such claim was brought. Nonetheless, preparation for *Howard I* obviously included the issue of future economic damages—as Howard's own testimony in *Howard I* indicates. Thus, not surprisingly, the third factor tends to suggest that the issue of punitive damages is not identical.

Finally, as discussed in the context of claim preclusion, while the underlying claims of retaliation in both cases are undoubtedly similar, they also involve distinct factual scenarios, so the fourth factor provides limited insight on the identical issue question.

### 3

In sum, while the second through fourth Restatement factors are not especially illuminating, under the first factor, the issue of economic damages is largely identical; there is a possibility of partial overlap on the issue of non-economic damages; and the issue of punitive damages is wholly separate.

### B

Apart from the identicality prong, the parties do not seriously contest the application of the other criteria for issue preclusion. There is no dispute that the question of damages actually was litigated in *Howard I*, and there was a full and fair opportunity to do so. While the issue of damages was not necessary to decide the merits of Howard's claims, making a damages determination became a necessary consequence of Howard's victory on the merits. *See Oyeniran*, 672 F.3d at 806.

Thus, we conclude that Howard is precluded from recovering economic damages which she has already received—namely the loss of the salary and benefits she could have earned as the City's Finance Director. Because Howard presents a new request for punitive damages, however, we must consider the merits of her suit against Craddock,[9] and because she may be able to demonstrate new non-economic damages, we will consider the merits of her suit against the City.[10]

IV

Howard's First Amendment retaliation claim alleges that the City refused to hire her for the Finance Director position in 2011 because of her suit in *Howard I*.

To establish a prima facie case of First Amendment retaliation, a plaintiff must prove that "(1) she engaged in protected speech; (2) the defendants took an 'adverse employment action' against her; and (3) her speech was a 'substantial or motivating' factor for the adverse employment action." *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004) (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003)). If a plaintiff can demonstrate a prima facie case,

---

[9] Punitive damages cannot be awarded against the City. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 267 (1981).

[10] Given our conclusion on the merits of Howard's First Amendment and state law claims, we need not decide the extent to which Howard's request for non-economic damages should be partially precluded on the basis of the July 2011 letter, or whether she may be able to request any new economic damages.

the burden shifts to the employer to demonstrate either that, under the balancing test established by *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), the employer's legitimate administrative interests outweigh the employee's First Amendment rights or that, under the mixed motive analysis established by *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977), the employer "would have reached the same decision even in the absence of the [employee's] protected conduct."

*Id.* (quoting *Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968, 976–77 (9th Cir. 2002)) (citations partially omitted).

## A

The parties do not contest that Howard's speech—her suit in *Howard I*—was protected. Thus, for purposes of our analysis, we assume *without deciding* that Howard has demonstrated the first factor.[11]

## B

The parties disagree on precisely what "adverse employment action" was taken by the City. Howard

---

[11] It is not a foregone conclusion that Howard's speech *actually* was protected, however. "[A] public employee's litigation must involve a matter of public concern in order to be protected by either the Petition Clause or the Speech Clause of the First Amendment." *Rendish v. City of Tacoma*, 123 F.3d 1216, 1220 (9th Cir. 1997). The City does not address whether Howard's suit involved a matter of public concern, so we will not do so either.

contends that the adverse action occurred when the City hired Baker, while the City maintains that the adverse action occurred when it sent the July 2011 rejection letter. Because there is no question that some adverse action occurred, however, we need not resolve this issue.

C

The parties strongly dispute whether Howard's suit was a "substantial" factor in the City's decision not to hire her. Howard relies on circumstantial evidence to argue that the City excluded her from consideration for the 2011 position because of her suit.

Circumstantial evidence can create "a genuine issue of material fact on the question of retaliatory motive" when the plaintiff provides "evidence that his employer knew of his speech"[12] and further "produce[s] evidence of at least one of the following three types": (1) showing a "proximity in time between the protected action and the allegedly retaliatory employment decision" such that a "jury logically could infer [that the plaintiff] was terminated in retaliation for his speech"; (2) demonstrating "that his employer expressed opposition to his speech . . . to him or to others"; or (3) showing that "his employer's proffered explanations for the adverse employment action were false and pretextual." *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 751–52 (9th Cir. 2001).

Howard maintains that "the sequence of events" demonstrates that the City refused to hire her because of her

---

[12] Since Howard brought suit against the City, there is no question that the City was aware of her speech.

suit. While we reject Howard's contention that the proximity of Baker's hiring to the jury verdict demonstrates causation,[13] there is no doubt that the City's decision not to hire Howard—whether dated to the July 2011 letter or Baker's hiring in November—occurred in the midst of the litigation in *Howard I*, and thus, raises the specter of causation.

We have held that speech which occurred within "three to eight months [of the adverse employment action] is easily within a time range that can support an inference of retaliation." *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003). Even "an eleven-month gap in time is within the range that has been found to support an inference that an employment decision was retaliatory." *Allen v. Iranon*, 283 F.3d 1070, 1078 (9th Cir. 2002).

However, we are mindful of avoiding "the logical fallacy of *post hoc, ergo propter hoc*." *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000). "[A] specified time period cannot be a mechanically applied criterion. A rule that any period over a certain time is per se too long (or, conversely, a rule that any period under a certain time is per se short enough) would be unrealistically simplistic." *Coszalter*, 320 F.3d at 977–78. Because "there is no set time

---

**13** The record indicates that that Baker was hired before the jury reached its verdict in *Howard I*. Craddock, the City Manager, offered Baker the job as City Finance Director on October 25, 2011, and she accepted on October 26. Although the formal paperwork surrounding Baker's hiring was not completed until November 7 or 8, the promotion became effective on November 1. The jury reached its verdict on November 2, 2011. As the July 2011 letter itself demonstrates, any rejection of Howard based on her speech must have been the result of her decision to file the suit, not the verdict she won.

. . . [w]hether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances." *Id.* at 978.

Howard's application was rejected while her suit was ongoing—there was no delay between her speech and the adverse employment action. Not only was there a direct correlation of time between her suit and rejection, the adverse employment action occurred in the context of the protracted heat of trial preparation.[14] Against the backdrop of such litigation, the timing of her rejection creates a strong inference that the City acted with a retaliatory motive.

D

Thus, assuming that Howard has presented a prima facie case—protected speech, an adverse employment action, and retaliatory motive (based on the chronological connection between her suit and rejection)—we must consider whether the City has carried its *Mt. Healthy* burden, demonstrating that it "would have reached the same decision even in the absence of [Howard's] protected conduct." *Thomas*, 379 F.3d at 808 (quoting *Ulrich*, 308 F.3d at 976–77).

---

[14] Howard does not discuss the second type of evidence—whether the City opposed her speech. *See Keyser*, 265 F.3d at 751–52. Of course the City necessarily opposed her speech by serving as the opposing party in her suit. The City was bound to respond to her complaint, however, so the probative value of the City's opposition may be limited—the City did not speak initially of its own accord. Nonetheless, the fact that the City was an opposing party in litigation underscores the adversarial relationship between the City and Howard at the time of her 2011 application.

The City maintains that even without Howard's suit, it would have refused to hire her because she had been previously terminated from the same position for cause. Although Howard was later vindicated at trial, when the City sent the rejection letter in July, the City's records indicated for-cause termination. It does not appear unreasonable for the City to reject her application on the basis of the record that existed at the time, even if the purported reason for the termination was later found pretextual.[15] To conclude otherwise would require public employers to conduct a new investigation into whether a prior employee's termination was justified whenever such employee applied for a job opening.[16]

Howard argues that the City's decision to hire Baker, who was significantly less-qualified than Howard, indicates that its stated reason for rejecting her application—that she previously had been terminated for cause—was false. Indeed, Howard contends that the City violated its own policy, which required employment to be "on the basis of merit, qualifications and competence," in hiring Baker because she lacked Howard's credentials.[17]

---

[15] Notably, when the City rejected her application, it had already been vindicated on all of Howard's other claims—whistleblower retaliation, wrongful discharge, and due process violation.

[16] Further, Craddock was not the City Manager when Howard was fired. Thus, to any extent that Howard's termination may have been the result of a personal vendetta between Howard and former City Manager Freeman, such dynamic had changed in 2011.

[17] Howard also points out that City policy also required all candidates to complete an application; Baker never did. However, City policy permits the City Manager to "authorize a less formal hiring

Howard is correct that, when viewed in isolation, Howard's greater credentials and the City's apparent violation of its own policies might support an inference of retaliation. Baker was not a CPA; Howard was. Howard had nineteen years of accounting experience (and ten years as City Finance Director); Baker had worked in public finance for three years.

However, when viewed in the broader hiring context, the City's actions are far less suspicious. Over the course of the two hiring periods for the Finance Director position, the City received a total of fifty-two applications, and it interviewed seven applicants. The top finalist in the first hiring period had thirty-three years of overall accounting experience (and twenty-nine years of municipal accounting experience) and the second finalist had twenty-two years of accounting experience. Thus, two of the finalists had greater accounting experience than Howard, and the City rejected both of them, hiring Baker instead. As the City argues, this strongly suggests that the City hired Baker on the basis of her performance as Acting Finance Director, rather than as an attempt to retaliate against Howard.

Indeed, the record demonstrates that the City repeatedly pursued Baker specifically. According to the City, Craddock first asked Baker to consider the City Finance Director position permanently when she was appointed Acting Finance Director in May 2011 (prior to Howard's application). Baker declined. After completing the first hiring period, which lasted from June to July (and rejecting candidates with 20–30 years of accounting experience), Craddock again approached Baker about applying for the

process." Thus, the fact that Baker never completed a formal application is not particularly informative.

job, and she again declined. At that point, Craddock explained to the City Council that it could take a leisurely approach to filling the position since Baker was "doing a great job" as Acting Director. The City commenced a second hiring period in August. After interviewing more applicants and failing to find someone suitable, Craddock approached Baker a third time about the position in October, and she finally assented. According to Craddock, Baker "was the best fit for the City." The City's repeated attempts to convince Baker to apply for the position, coupled with its rejection of candidates with even more experience than Howard, makes clear that the City would have hired Baker even if Howard had never brought suit.

Thus, no reasonable jury could find that Howard's suit was a substantial reason for the City's refusal to consider her for the Finance Director position in 2011. Rightly or wrongly, because of her previous termination, the City has demonstrated that it would have rejected Howard's application in 2011, irrespective of her suit, and hired Baker instead. Accordingly, the district court correctly concluded that Howard's First Amendment claim does not survive summary judgment.[18]

V

Finally, Howard claims that the City violated Oregon's Whistleblower Act by rejecting her application. The relevant provision provides:

---

[18] Because we conclude that Howard's First Amendment claim fails on its merits, there is no need to address separately whether Craddock is entitled to qualified immunity. *See Glenn v. Washington Cty.*, 673 F.3d 864, 870 (9th Cir. 2011).

It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an *employee* with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employee has in good faith reported criminal activity by any person, has in good faith caused a complainant's information or complaint to be filed against any person, has in good faith cooperated with any law enforcement agency conducting a criminal investigation, has in good faith brought a civil proceeding against an employer or has testified in good faith at a civil proceeding or criminal trial.

Or. Rev. Stat. § 659A.230(1) (2016) (emphasis added).

The City maintains that because Howard was not an employee when it rejected her 2011 application, her claims necessarily fail as a matter of law. Howard argues that § 659A.230 should be read to permit claims of retaliation brought by *former* employees.

### A

The Act does not specifically provide a definition of "employee" for § 659A.230. "If the legislature has not defined a statutory term, Oregon courts 'ordinarily look to the plain meaning of a statute's text as a key first step in determining what particular terms mean.'" *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 998–99 (9th Cir. 2017) (quoting *Comcast Corp. v. Dept. of Revenue*, 337 P.3d 768, 776 (Or. 2014). In so doing, Oregon courts frequently "consult dictionar[ies]," *Comcast Corp.*, 337 P.3d at 776,

and examine the "context of the statute," *Roberts v. Oregon Mut. Ins. Co.*, 255 P.3d 628, 632 (Or. Ct. App. 2011). Finally, Oregon courts consider "any helpful legislative history offered by the parties." *Id*.

*Webster's Third New International Dictionary* (2002) defines "employee" as "one employed by another."[19] *Black's Law Dictionary* (10th ed. 2014) defines "employee" as "[s]omeone who *works* in the service of another person (the employer)." (emphasis added). Both of these definitions seem to suggest that to be an "employee" one must be *actively* employed.

Similarly, although the Oregon Whistleblower Act does not provide a definition of "employee" as used in § 659A.230, a closely related provision of the Act, Or. Rev. Stat. § 659A.200, provides a number of definitions of "employee." These definitions all refer to "a person . . . [e]mployed" or "[s]erving"—present tense—rather than someone who was employed or will be employed—past or future tenses. Thus, Or. Rev. Stat. § 659A.200 also seems to suggest that one must be actively employed to count as an "employee."

However, the strongest argument against applying § 659A.230 to Howard is the language surrounding "employee" in the statute. Section 659A.230 makes it unlawful "for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms,

---

[19] The Oregon Supreme Court "most often looks to the definitions provided in *Webster's Third New Int'l Dictionary*," although when the "term is a legal one" it looks to "legal dictionaries" such as *Black's Law Dictionary*. *Comcast Corp.*, 337 P.3d at 776 & n.7.

conditions or privileges of employment." Prohibiting demotion or suspension "with regard to promotion, compensation or other terms, conditions or privileges of employment" necessarily applies only to current employees.

While, in the abstract, discrimination or retaliation might be read to encompass non-employees, it is unclear how discrimination or retaliation "with regard to promotion, compensation or other terms, conditions or privileges of employment" could affect Howard. In order to experience discrimination, one must be entitled to "promotion, compensation or other terms, conditions or privileges of employment." A mere job applicant is not in such a position, regardless of any status as a former employee. [20]

Thus, the statutory context bolsters the dictionary definitions.[21] Under the plain meaning of § 659A.230, Howard cannot bring a claim as an "employee."

B

Howard contends that the Oregon Whistleblower Act should be construed analogously to Title VII of the United States Code, specifically, 42 U.S.C. § 2000e-3(a), and thus, following *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997), the term "employee" should be read to include

---

[20] However, this logic does not necessarily entail that a former employee could *never* bring suit under § 659A.230. For example, if one's employment was terminated, and she never received her final paycheck, it is conceivable that she could have a claim of retaliation "with regard to . . . compensation" based on a benefit that accrued while she was an employee. We need not resolve whether § 659A.230 permits suit in such situation here.

[21] The parties do not point us to "any helpful legislative history," *Roberts*, 255 P.3d at 632, so we need not consider it.

"former employees." *Cf. Hunt v. City of Portland*, 726 F. Supp. 2d 1244, 1256–57 (D. Or. 2010), *aff'd*, 496 F. App'x 751 (9th Cir. 2012), and *aff'd*, 599 F. App'x 620 (9th Cir. 2013).

Howard is correct "that Oregon courts may examine federal precedent for contextual support when they construe state statutes that parallel federal law." *Portland State Univ. Chapter of Am. Ass'n of Univ. Professors v. Portland State Univ.*, 291 P.3d 658, 666 (Or. 2012). And the Oregon Supreme Court has "looked to Title VII precedent to analyze claims brought under other, analogous provisions of ORS chapter 659A." *Id.* The key, however, is that the provisions must be "analogous." Oregon courts have applied Title VII precedent to subsections of chapter 659A that they found "virtually verbatim" or "substantially similar." *Id. See also Vaughn v. Pac. Nw. Bell Tel. Co.*, 611 P.2d 281, 289 (Or. 1980) (noting the similarity of Or. Rev. Stat. §§ 659.121(1), 659.410, and 659.415 to provisions of Title VII).

While Howard maintains that Or. Rev. Stat. § 659A.230 should be construed analogously to 42 U.S.C. § 2000e-3(a), the Oregon Supreme Court already has disposed of this claim by holding that a different state law, Or. Rev. Stat. § 659A.030(1)(f), is directly analogous to 42 U.S.C. § 2000e-3(a). *See Portland State Univ.*, 291 P.3d at 667; *Pool v. VanRheen*, 297 F.3d 899, 910 (9th Cir. 2002).

Section 659A.030(1)(f) makes it unlawful:

> [f]or any person to discharge, expel or otherwise discriminate against *any other person* because that other person has opposed any unlawful practice, or because that other person has filed a complaint, testified or

> assisted in any proceeding under this chapter
> or has attempted to do so.

(emphasis added). Thus, because it prohibits discrimination against "any other person," by its plain terms, § 659A.030(1)(f) would likely apply to former employees like Howard. Similarly, 42 U.S.C. § 2000e-3(a) makes it "unlawful . . . for an employer to discriminate against any of his employees or applicants for employment." This provision also would likely apply to Howard because she was an "applicant[] for employment."

In contrast to Or. Rev. Stat. § 659A.030(1)(f) and 42 U.S.C. § 2000e-3(a), both of which are broad antidiscrimination provisions, Or. Rev. Stat. § 659A.230 applies only to retaliation against "an employee." We assume that the Oregon legislature's decision to use "employee" in § 659A.230, but "any other person" in § 659A.030(1)(f), was deliberate. The obvious implication of *Portland State University* is that if Or. Rev. Stat. § 659A.030(1)(f) is directly analogous 42 U.S.C. § 2000e-3(a), then Or. Rev. Stat. § 659A.230 is not an equivalent provision and should not be construed identically.[22]

---

[22] There is no doubt that the Oregon legislature knows how to enable non-employees to bring discrimination claims when it so chooses. In addition to § 659A.030(1)(f), Or. Rev. Stat. § 659A.030(1)(a) makes it unlawful for an employer "to refuse to hire or employ [an] individual or to bar or discharge [an] individual from employment" on the basis of "race, color, religion, sex, sexual orientation, national origin, marital status or age."

## C

Absent any indication that the term "employee" as used in § 659A.230 is ambiguous,[23] we apply the plain meaning of the word as referring to those who have "an existing employment relationship with the employer in question." *Robinson*, 519 U.S. at 341; *see also Walters v. Metro. Educ. Enters, Inc.*, 519 U.S. 202, 207 (1997) ("In common parlance, an employer 'has' an employee if he maintains an employment relationship with that individual."). Thus, Howard's claim under Or. Rev. Stat. § 659A.230 fails as a matter of law.

## VI

For the foregoing reasons, the district court's judgment is **AFFIRMED**.

---

[23] In *Robinson*, the Supreme Court concluded that the term "employee" was ambiguous on the basis of its surrounding statutory context. 519 U.S. at 341–45. Howard has offered no such argumentation here. Instead, as discussed, under Oregon law the use of the term "employee" contrasts with the use of "any other person" or "individual" in similar employment discrimination provisions. *Compare* Or. Rev. Stat. § 659A.230 *with* § 659A.030(1)(f) *and* § 659A.030(1)(a).