FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RODNEY BURCH,

*Plaintiff-Appellant*,

v.

CITY OF CHUBBUCK, a political subdivision of the State of Idaho; and KEVIN B. ENGLAND, in his individual and official capacity,

*Defendants-Appellees*.

No. 24-3646

D.C. No. 4:22-cv-00366-AKB

OPINION

Appeal from the United States District Court
for the District of Idaho
Hon. Amanda K. Brailsford, District Judge, Presiding

Argued and Submitted April 22, 2025
Moscow, Idaho

Filed July 25, 2025

Before: Richard C. Tallman, N. Randy Smith, and Ryan D. Nelson, Circuit Judges

Opinion by Judge Tallman

# SUMMARY[*]

## First Amendment/Retaliation

The panel affirmed the district court's summary judgment for the City of Chubbuck, Idaho, and the City's Mayor, Kevin England, in Rodney Burch's action, under 42 U.S.C. § 1983 and Idaho state law, alleging that defendants took adverse employment actions against him because of his protected speech made while he was the Public Works Director.

Burch's speech falls into two categories: (1) his criticisms of England's policies and performance as Mayor, as well as his proposal and advocacy to create a city administrator position as a solution to England's alleged deficiencies; and (2) his political yard sign supporting England's opponent during England's re-election campaign.

Applying a five-step inquiry to balance Burch's interest as a citizen to comment on matters of public concern and the interest of the State as an employer, the panel held that Burch's First Amendment retaliation claim failed as a matter of law. At step one, Burch's speech addressed a matter of public concern. At step two, Burch's yard sign supporting England's mayoral opponent was protected speech, but his criticism of England's policies and performance and advocacy for adding a city administrator was made pursuant to his official duties as the Public Works Director and therefore was unprotected. At step three, a reasonable

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

factfinder could find that Burch suffered at least one adverse employment action—though not a constructive discharge—and that Burch's yard sign was a "substantial or motivating factor" in at least one of the adverse employment actions. However, at steps four and five, in which the burden shifts to defendants, the panel held that there was no genuine dispute that defendants had an adequate justification for their adverse actions—including asking Burch to resign, transferring his duties and reducing his workload—and would have reached the same employment decisions had Burch never erected his yard sign.

Finally, the panel held that the district court properly granted summary judgment for defendants on Burch's Idaho state law claim because none of the adverse employment actions occurred within the statute of limitations.

**COUNSEL**

DeAnne Casperson (argued), Amanda E. Ulrich, and Ryan S. Dustin, Casperson Ulrich Dustin PLLC, Idaho Falls, Idaho, for Plaintiff-Appellant.

Sam L. Angell (argued) and Blake G. Hall, Hall Angell & Associates LLP, Idaho Falls, Idaho; for Defendants-Appellees.

# OPINION

TALLMAN, Circuit Judge:

Plaintiff-Appellant Rodney Burch, the former Public Works Director for the City of Chubbuck, Idaho, appeals the district court's grant of summary judgment in favor of his former employer, the City, and his former superior, Mayor Kevin England ("Appellees"). Burch brought claims under 42 U.S.C. § 1983 for First Amendment retaliation and the Idaho Protection of Public Employees Act, Idaho Code § 6-2104, based on the theory that England took adverse employment actions against Burch as a result of Burch's protected speech made while he was the Public Works Director. The speech at issue falls into two categories: (1) Burch's criticisms of England's policies and performance as Mayor, as well as Burch's proposal and advocacy to create a city administrator position as a solution to England's alleged deficiencies;[1] and (2) Burch's political yard sign supporting England's opponent during England's re-election campaign. We hold that both claims fail as a matter of law and we affirm the district court's grant of summary judgment for Appellees.

---

[1] This category of speech forms the basis for Burch's state law claim. For purposes of that claim, Burch characterized this speech as "communicat[ing] in good faith the existence of waste of public funds and/or property of the City of Chubbuck." *See* Idaho Code § 6-2104(1)(a) ("An employer may not take adverse action against an employee because the employee . . . communicates in good faith the existence of any waste of public funds, property or manpower . . . .").

**I**

In 2015, Mayor England appointed Burch to be the city's Public Works Director, one of six appointed officers who reported directly to England and worked under the general direction of both the Mayor and City Council.

Burch's role was expansive. He was responsible for administering and managing street maintenance, water and wastewater, sanitation, parks and recreation, engineering, building inspections, planning and economic development, and the city garage. Burch supervised several department heads within the Public Works Department, who in turn supervised 40–45 employees. He also engaged in strategic planning and policymaking regarding existing city ordinances, employee manuals, and processes for employee evaluations. Burch described his work as including "City Wide Priorities Management," "Long Range Goals," and "Department Efficiencies" including "Budgeting" and "5 year planning." According to Burch, he also took on duties "outside of traditional public works," including "[e]verything from dealing with utility billing to the design and construction of city hall." Burch believed that his workload equated to approximately 2.5 full-time positions.

For the first six years of Burch's tenure, he and England had a good working relationship. During that time, Burch communicated his concerns regarding city management directly to England without issue. For example, in 2018, Burch told England that, in his view, certain accounting and operational practices were a waste of public funds. Among other things, Burch told England that city government misallocated expenses across its departments and had an inefficient system for authorizing work orders. As a result of these and other concerns, Burch and the Public Works

Department developed a strategic plan for the city ("2018 Strategic Plan"). Burch obtained public input for the Plan, drafted the Plan, presented it to the City Council, and obtained City Council approval.

However, in 2021, England and Burch's relationship soured after Burch proposed switching the city's management structure from a "strong mayor" system to a "weak mayor" system by creating a city administrator position. By this time, Burch had grown increasingly frustrated with England's policies and performance as Mayor. Burch believed that England had failed to properly implement the 2018 Strategic Plan, that England's approach to budgeting and his adoption of an online utility bill-pay credit program had decreased revenue, and that England was ineffective in helping Public Works manage its workload. Burch thought that a city administrator would solve these problems by ensuring better oversight of operations, preventing waste of funds and manpower, enabling a smooth transition between mayors, and allowing England to be more successful.

In early 2021, Burch began to discuss alternative city management approaches with England and the Human Resources ("HR") Director, Scott Gummersall. On April 19, 2021, Burch sent a letter to England formally proposing that Chubbuck create a city administrator position. Burch claims that England initially supported the idea and directed him to review the proposed organizational structure and to work with Gummersall to create an appropriate job description.[2]

---

[2] England disputes this and maintains that he was never in favor of the proposal. Regardless, this is not a genuine dispute that precludes summary judgment. As explained in Section IV(A)(3), even crediting

During this time, Burch also discussed the proposal with members of the City Council, and some were in support.

On June 1, 2021, Burch sent a memorandum to England enclosing information regarding the city administrator proposal that Burch claims he prepared at England's request. One of those enclosed documents, referred to in the memorandum as "Options is [sic] process, My operational concerns, concerns from other staff" ("Options in Process document"), contained Burch's serious criticisms of England's policies and performance.[3]  The document stated, among other criticisms, that England "[l]ack[ed] [] commitment to follow through or monitor important operational items"; was "[u]nable or unwilling to hold staff accountable"; had "[n]o clear/committed vision"; "publicly t[ook] credit" for issues that he did not handle; and had "perception" problems including spending time on social media instead of working and not being trusted to

---

Burch's version of events as the non-moving party, no reasonable factfinder could return a verdict for Burch.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

[3] England testified at his deposition that on or around May 27, 2021, Burch, Gummersall, and one of Burch's employees met with England and presented the Options in Process document to England.  According to England, he excused himself from the meeting because he needed time to process the document.  Since it is undisputed that England received the Options in Process document shortly afterward on June 1, 2021, whether he first received it on May 27 is not material to Burch's claims. *See Ochoa v. City of Mesa*, 26 F.4th 1050, 1055–56 (9th Cir. 2022) ("A material fact is one that is needed to prove (or defend against) a claim, as determined by the applicable substantive law." (quoting *Anderson*, 477 U.S. at 255)).  As explained in Section IV(A)(3), even crediting Burch's version of events as the non-moving party, no reasonable factfinder could return a verdict for Burch.  *See Anderson*, 477 U.S. at 255.

"objectively address issues." The document also contained feedback that Burch purportedly gathered from other staff, including that England "[a]ctively discourage[ed] teamwork"; was "unaware of the actual problems"; was subject to the City Treasurer's "incredible influence over him"; and was unaware of the "toxic work environment" within city government.

After England received the memorandum and enclosed documents, Burch and England met privately to discuss the city administrator proposal and Burch's ongoing concerns with England's policies and performance. According to Burch, shortly thereafter, England told Burch that he no longer supported the proposal to add a city administrator and asked Burch to stop advocating for it. Soon afterward, England met with the City Council to discuss the proposal and Councilmember Melanie Evans asked England to reconsider his opposition. However, England refused to change his position and the proposal ultimately failed. Burch believed that England's attitude began to "cool" toward him and that England began "cutting [Burch] out of meetings and decisions."

As a result of England's opposition to the city administrator proposal, Councilmember Dan Heiner challenged England in the 2021 mayoral election. Burch decided to support Heiner's candidacy and placed a campaign sign for Heiner in his front yard, but did not otherwise campaign for Heiner or against England. At some point between June 2021 and November 2021, one of Burch's neighbors informed England of Burch's yard sign. Burch and England never discussed Burch's support for Heiner or his yard sign prior to the election, and Burch did not discuss his support for Heiner at his workplace.

On November 2, 2021, England won re-election. Shortly thereafter, England spoke with the city's legal counsel about what was required to remove Burch, and the counsel explained that England would have to show cause. England also met with HR Director Gummersall to discuss whether England could request Burch's resignation and what would constitute cause for removal. Gummersall asked why England wanted Burch to resign, and England responded that he no longer trusted Burch. England then reviewed and compiled documents that he believed showed cause for Burch's removal, including the Options in Process document. When England and Gummersall met again that week, England explained that he distrusted Burch because of Burch's city administrator proposal and his Options in Process document. England also expressed concern that Burch and others were trying to remove him from office.

That same week, on November 5, 2021, England met with Burch alone. According to Burch, England stated that he no longer had confidence in Burch and asked Burch to resign.[4] However, England agreed with Burch that Burch had not done anything that necessitated his resignation. Burch told England that he would take the weekend to think about his options. This was the first time that the two had had an adverse conversation regarding Burch's continued employment. Later that day, England asked one of Burch's

---

[4] England disputes this and maintains that he did not want Burch to resign because he believed that they could continue working well together as they had in the past. According to England, it was Burch who implied that he should be removed from his position and stated that "one of us has got to go and you just won [the] election." But as explained in Section IV(A)(3), even crediting Burch's version of events as the non-moving party, no reasonable factfinder could return a verdict for Burch. *See Anderson*, 477 U.S. at 255.

subordinate Public Works department heads to serve as the Interim Public Works Director if Burch resigned.

On the following Monday, November 8, 2021, Burch informed England that he did not want to resign. According to Burch, the two met again that afternoon where England asked him to reconsider and Burch refused.[5] Also according to Burch, during this second meeting England referenced Heiner as "[Burch's] candidate."

Immediately afterward, England scheduled an executive session of the City Council on November 10, 2021, to argue for removing Burch since the Council's approval was required to do so. *See* Idaho Code § 50-206; City Code of Chubbuck, Idaho § 2.10.010. According to Burch, at the session England produced documents for the Council, including the Options in Process document, and told the Council that he and Burch could no longer work together. Burch claims that England also yelled at Councilmember Evans for supporting Heiner in the election. Ultimately, the Council declined to remove Burch and instructed England and Burch to continue working together.

On November 15, 2021, England sent Burch an email with the subject line "Moving forward" that asked Burch how he viewed their working relationship and whether he had suggestions for how the two should move forward. In response, Burch stated, among other things, that he would "focus on [his] role as Public Works Director," and that he

---

[5] England disputes this and maintains that he did not meet with Burch again that day or ask him to reconsider resigning. But once again, as explained in Section IV(A)(3), even crediting Burch's version of events as the non-moving party, no reasonable factfinder could return a verdict for Burch. *See Anderson*, 477 U.S. at 255.

would "cease further private conversations with Council [members] related to [England's] performance."

According to Burch, by this time, his "working relationship with England [had] essentially ended" because England had cut him out of certain decision-making and duties. Burch still attended weekly officer meetings with England, conducted weekly meetings with Public Works department heads, and managed Public Works administrative staff. However, Burch alleged that his role changed in three key respects.

First, the city's Finance Director began bypassing Burch by bringing finance and budgeting issues to one of Burch's subordinate department heads rather than Burch. Burch believed that England was to blame for this. Second, Burch believed that England transferred "[a]ll of the planning responsibilities" and the "policies, decisions, and functions" to the city's head of Economic Development and Community Services. Finally, England transferred the responsibility of conducting a leadership training from Burch to Gummersall. According to Gummersall, England stated that he did so because he believed that the training was Burch's attempt to remove him from office.[6]

By March 2022, Burch claims that his workload was reduced to 70–80% of a full-time position. As a result, on March 3, 2022, Burch submitted his resignation effective April 8, 2022. On April 7, 2022, Burch sent a letter to HR

---

[6] England disputes this and maintains that he transferred responsibility for the training from Burch to Gummersall to lessen Burch's workload after Burch complained that he had too many responsibilities and needed help from England. As explained in Section IV(A)(3), Burch does not raise material facts on this issue to preclude summary judgment. *See Ochoa*, 26 F.4th at 1055–56.

explaining that, among other things, he was resigning because England retaliated against him based on his protected speech.  On August 23, 2022, Burch filed the present action in federal court for the District of Idaho. Appellees denied the allegations and did not assert any immunity defenses available under § 1983.  Following discovery, Appellees moved for summary judgment on both claims.  The district court granted summary judgment for Appellees, and Burch timely appealed.

## II

The district court had jurisdiction to adjudicate the action under 28 U.S.C. §§ 1331, 1343, 1367.  We have appellate jurisdiction to hear this appeal of the district court's final order under 28 U.S.C. § 1291.

## III

We review the district court's grant of summary judgment de novo.  *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 776 (9th Cir. 2022) (citation omitted).  "Summary judgment is appropriate only when 'there is no genuine issue as to any material fact.'"  *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)).  Because Burch was the non-moving party, we view the evidence in the light most favorable to him and "all justifiable inferences are to be drawn in his favor."  *Garcetti v. Ceballos*, 547 U.S. 410, 442 n.13 (2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## IV

## A

We first examine whether the district court properly granted summary judgment for Appellees on Burch's First Amendment retaliation claim.  The First Amendment protects against the government "abus[ing] its position as employer to stifle 'the First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of public interest.'"  *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) (second alteration in original) (quoting *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968)). In determining whether a government employer retaliated against a public employee in violation of the First Amendment, the Supreme Court has instructed us to "balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Pickering*, 391 U.S. at 568.  In *Eng v. Cooley*, we distilled *Pickering* into a five-step inquiry:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse

employment action even absent the protected speech.

552 F.3d at 1070.

It is the plaintiff's burden to demonstrate the first three steps to make out a prima facie case of First Amendment retaliation. *Dodge*, 56 F.4th at 776 (citing *Howard v. City of Coos Bay*, 871 F.3d 1032, 1044 (9th Cir. 2017)). The first two steps—whether the plaintiff spoke on a matter of public concern, and if so, whether that speech was made as a private citizen or as a public employee—form the lodestar question of whether the plaintiff's speech is protected under the First Amendment. *Id.* at 777 (citing *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 961 (9th Cir. 2011)). If the plaintiff's speech is not protected, our inquiry ends there. But if the speech *is* protected, the plaintiff must then demonstrate the third step: that the protected speech was "a 'substantial or motivating' factor" for the alleged adverse employment action(s). *Id.* at 776 (quoting *Howard*, 871 F.3d at 1044).

If the plaintiff makes that showing, the burden shifts to the government to demonstrate steps four and five: that it had "an adequate justification for treating the employee differently from any other member of the general public," or alternatively, that it "would have reached the same [adverse employment] decision even in the absence of" the protected speech. *Eng*, 552 F.3d at 1071–72 (alteration in original) (first quoting *Garcetti*, 547 U.S. at 418; and then quoting *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004)). Only if the government fails *both* the fourth and fifth steps does the plaintiff establish a First Amendment violation. *Greisen v. Hanken*, 925 F.3d 1097, 1108 (9th Cir. 2019).

**1**

We begin with the lodestar question of whether there is a genuine dispute as to whether either category of Burch's speech is protected. We answer this by assessing whether a reasonable factfinder could find that Burch established the first two *Pickering* steps: (1) that he "spoke on a matter of public concern," *and* (2) that he "spoke as a private citizen" rather than as "a public employee." *Dodge*, 56 F.4th at 777 (quoting *Johnson*, 658 F.3d at 961). The first step poses a question of law. *Greisen*, 925 F.3d at 1109. The second poses a mixed question of law and fact. *Posey*, 546 F.3d at 1126–29.

**a**

The first step—assessing whether Burch's speech addressed a matter of public concern—presents a low bar. "Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'" *Eng*, 552 F.3d at 1070 (quoting *Johnson v. Multnomah County*, 48 F.3d 420, 422 (9th Cir. 1995)). "It is only 'when it is clear . . . the information would be of *no* relevance to the public's evaluation of the performance of governmental agencies'" that such speech does not address a matter of public concern. *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 978 (9th Cir. 2002) (alteration in original) (quoting *Pool v. Vanrheen*, 297 F.3d 899, 907 (9th Cir. 2002)).

As a matter of law, Burch's yard sign expressing his political support for England's mayoral opponent addresses a matter of public concern. *See Dodge*, 56 F.4th at 773, 777 (holding that public employee wearing a "Make America Great Again" hat to workplace training addressed a matter of public concern because expressions regarding candidates

for office "inherently relate to the political, social, or other concern to the community" (internal quotation marks and citation omitted)).

Likewise, as a matter of law, Burch's criticisms of England's policies and performance and Burch's proposal and advocacy for adding a city administrator—which, according to Burch, was a "remedy for Mayor England's failure to perform basic oversight functions and ensure the City would not waste funds and manpower"—address a matter of public concern. *See Posey*, 546 F.3d at 1130 ("'[C]ommunication on matters relating to the functioning of government . . . [such as] misuse of public funds, wastefulness, and inefficiency in managing and operating government entities are matters of inherent public concern,' regardless of the purpose for which they are made." (alterations in original) (quoting *Multnomah County*, 48 F.3d at 425)).

**b**

Because both categories of Burch's speech address matters of public concern, the second question—whether Burch's speech was made as a public employee or as a private citizen—determines whether either category of speech is protected. This is because, even when speaking on matters of public concern, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti*, 547 U.S. at 421. To determine whether Burch's speech was made pursuant to his duties as a city employee, we look beyond the four corners of his formal job description and conduct a "practical" and "fact-intensive" inquiry using the three factors that we set forth in *Dahlia v. Rodriguez*: (1) asking "whether or not the employee confined his

communications to his chain of command"; (2) examining "the subject matter of the communication"; and (3) asking whether the employee spoke in "direct contravention to his supervisor's orders."   735 F.3d 1060, 1074–76 (9th Cir. 2013) (en banc).

### i

Under the first *Dahlia* factor, "whether or not the employee confined his communications to his chain of command is a relevant, if not necessarily dispositive, factor in determining whether he spoke pursuant to his official duties." *Id.* at 1074. "[G]enerally, when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job" and is less likely to be protected.   *Id.* (internal quotation marks and citation omitted).    Whereas "[w]hen a public employee communicates with individuals or entities outside of his chain of command, it is unlikely that he is speaking pursuant to his duties," making it more likely that the speech is protected.  *Id.* (citations omitted).

For Burch's yard sign supporting England's mayoral opponent, this factor weighs in favor of that speech being protected.   Burch displayed the sign to the general public outside of his home and did not discuss it at his workplace. Since Burch communicated his support of Heiner well beyond his chain of command, it is "unlikely that he [spoke] pursuant to his duties."  *Id.* (citations omitted).

However, the opposite is true of Burch's criticisms of England's policies and performance and Burch's proposal and advocacy for adding a city administrator.  Burch largely confined this speech to his chain of command, weighing against it being protected.  *Id.*  The two primary audiences

for this speech were England and the City Council, and there is no genuine dispute that both are in Burch's chain of command. Burch's job description states that the Public Works Director serves under the "general direction of the Mayor and City Council." While the employee's formal job description is not dispositive since it may not accurately reflect the employee's actual duties, *Garcetti*, 547 U.S. at 424–25, Burch confirmed its accuracy in an email to England stating that, "[i]n accordance with my job description, I serve under the 'general direction of Mayor and Council.'" Further, state and municipal law require that both the Mayor and City Council approve of the Public Works Director's removal. *See* Idaho Code § 50-206; City Code of Chubbuck, Idaho § 2.10.010. In light of all this, Burch's argument that the City Council is not in his chain of command because he did not report to the Council on the day-to-day is unpersuasive. Even though the Council did not directly supervise Burch, the record makes clear that the Council was in his chain of command.

While Burch also spoke to Gummersall (who is undisputedly outside of Burch's chain of command) about the city administrator proposal, he did so primarily to create a job description for the proposed city administrator to present to England. We agree with the district court that creating a job description with the HR Director, whose responsibility is to do just that, does not weigh in favor of Burch's speech being made as a private citizen.

**ii**

The second *Dahlia* factor asks whether the public employee's speech is more akin to a "routine" report or function of their position, rather than an attempt to raise alarm bells on an issue not normally within the employee's

purview. *Dahlia*, 735 F.3d at 1075. Such "routine" speech is less likely to be protected. *Id.*; *see Garcetti*, 547 U.S. at 421–22 (explaining that "speech that owes its existence to a public employee's professional responsibilities" is unprotected).

For Burch's yard sign supporting England's mayoral opponent, this factor also weighs in favor of that speech being protected. There is no genuine dispute that endorsing a political candidate—let alone the current Mayor's opponent—was not akin to a routine function of the Public Works Director. This weighs in favor of Burch's yard sign being protected speech. *Dahlia*, 735 F.3d at 1075.

However, once again, the opposite is true of Burch's criticisms of England's policies and performance and Burch's proposal and advocacy for adding a city administrator. Burch had a history of expressing his criticisms to England regarding wasteful and ineffective accounting and operational practices, misallocated expenses across departments, and the inefficient system for authorizing work orders. Burch also engaged in strategic planning and policymaking, including spearheading the 2018 Strategic Plan. Much like Burch's city administrator proposal, this involved drafting the Plan, presenting it to the City Council, and obtaining City Council approval. In fact, Burch testified that his city administrator proposal was a direct result of England's purported failure to implement the 2018 Strategic Plan.

Burch argues that because England "never asked" him to create the 2018 Strategic Plan nor the city administrator proposal, those were not Burch's official duties. But our "practical" inquiry goes beyond the duties listed in Burch's formal job description and asks what duties he routinely

*performed*. *Garcetti*, 547 U.S. at 424–25; *accord Barone v. City of Springfield*, 902 F.3d 1091, 1099 (9th Cir. 2018). By Burch's own account, his work included "City Wide Priorities Management," "Long Range Goals," and "Department Efficiencies" including "Budgeting" and "5 year planning." Burch also testified that he routinely took on duties "outside of traditional public works." There is no genuine dispute that Burch's criticisms of England's policies and performance and Burch's proposal and advocacy for adding a city administrator were akin to a routine function of his role as the Public Works Director. This weighs against this speech being protected. *Dahlia*, 735 F.3d at 1075.

### iii

The final *Dahlia* factor asks whether the public employee spoke "in direct contravention to his supervisor's orders," because speech that defies such orders "may often fall outside of the speaker's professional duties," making it more likely that the speech is protected. *Id.*

For Burch's criticisms of England's policies and performance and Burch's proposal and advocacy for adding a city administrator, this factor also weighs against that speech being protected. Burch admits that he stopped advocating for adding a city administrator after England told him to do so at their June 2021 meeting. Burch also stopped criticizing England following the City Council executive session where the Council instructed Burch and England to continue working together. Shortly after the session, Burch emailed England stating that he would "focus on [his] role as Public Works Director," and "cease further private conversations with Council [members] related to [England's] performance." Because Burch "appears to have done precisely what his superiors wanted him to do . . . we

cannot say that [Burch] acted in contravention of their orders," which weighs against this speech being protected. *Id.* at 1077.

Burch argues that an email exchange he had with Councilmember Evans on June 9, 2021—in which he approved of her draft email to send to England asking him to reconsider his opposition to the city administrator proposal—constitutes Burch contravening England's order to stop advocating for the proposal. But Evans's email to England is an expression of *her* opinion based on her perspective and position as a City Councilmember. Burch was not even included on Evans's email to England. Burch also testified that he had little knowledge or context behind the exchange, that only portions of Evans's draft email represented his opinions, and that he did not believe that Evans's email was an attempt to change England's mind. Beyond this, Burch did not provide any evidence that he advocated for the proposal after England told him to stop.[7] There remains no genuine dispute that Burch did not contravene England's order to stop advocating for adding a city administrator.

In sum, our "practical" inquiry shows that there is no genuine dispute that this category of speech was made pursuant to Burch's official duties as the Public Works Director, rather than as a private citizen. *Garcetti*, 547 U.S.

---

[7] Burch's argument that his yard sign for Heiner constitutes continued advocacy for the city administrator proposal because it is "all part of the same speech regarding Mayor England's failure to effectively manage the City and waste public funds" is unpersuasive. Political speech is distinct from other types of speech. *See Dodge*, 56 F.4th at 783. That Burch engaged in two separate and distinct sets of speech partly for the same reason—his frustration with England's policies and performance— does not merge those two sets of speech.

at 424; *see Brandon v. Maricopa County*, 849 F.3d 837, 846 (9th Cir. 2017) (examining the *Dahlia* factors in totality and concluding that, "[t]aken together, the only possible outcome of the 'practical inquiry' required by *Garcetti*" was that the employee's speech was within their official duties). Thus, this speech is unprotected. *Brandon*, 849 F.3d at 846.

We come to the opposite conclusion for Burch's yard sign supporting England's mayoral opponent. While England never told Burch to take down the sign and so Burch did not contravene any order by keeping it up, "this lone factor is not enough to transform" Burch's private speech to that made as an employee. *Barone*, 902 F.3d at 1100. When assessing the *Dahlia* factors for this speech in totality, there is no genuine dispute that Burch did not erect his yard sign pursuant to his official duties. *See Dodge*, 56 F.4th at 778 (holding that the employee "had no official duty to wear the [Make America Great Again] hat, and it was not required to perform his job"). Thus, Burch's yard sign is protected speech. However, this does not mean that Burch has established a First Amendment violation based on that speech.

## 2

For Burch's First Amendment retaliation claim to survive, Burch's only protected speech—his yard sign supporting Heiner—must pass the remaining third, fourth, and fifth *Pickering* steps. At the third step, "the plaintiff bears the burden of showing the state took an adverse employment action against the plaintiff and that the plaintiff's speech was a substantial or motivating factor in the adverse action." *Greisen*, 925 F.3d at 1113 (citing *Eng*, 552 F.3d at 1071). Thus, there are two inquiries under this third step: (1) whether any of England's alleged acts

constitute an adverse employment action; and (2) if so, whether Burch's yard sign was a substantial or motivating factor for the adverse employment action(s).

**a**

A reasonable factfinder could find that Burch suffered at least one adverse employment action. "In a First Amendment retaliation case, an adverse employment action is an act that is reasonably likely to deter employees from engaging in constitutionally protected speech." *Coszalter v. City of Salem*, 320 F.3d 968, 970 (9th Cir. 2003). An adverse employment action "need not be severe and it need not be of a certain kind" because "[v]arious kinds of employment actions may have an impermissible chilling effect." *Id.* at 975. However, "minor acts, such as 'bad-mouthing,' that cannot reasonably be expected to deter protected speech" do not amount to adverse employment actions. *Id.* at 976.

Here, Burch alleges that England took adverse employment actions by: (1) asking Burch to resign; (2) attempting to remove Burch from his position through the City Council; and (3) transferring some of Burch's duties to other employees and reducing Burch's involvement in certain decision-making. Burch further alleges that he was constructively discharged.

First, a reasonable factfinder could find that England's requests for Burch's resignation and subsequent attempt to remove him through the City Council constitute adverse employment actions. Asking for an employee's resignation is arguably "an act that is reasonably likely to deter employees from engaging in constitutionally protected speech." *Id.* at 970; *Dodge*, 56 F.4th at 779 ("[T]he insinuation or threat that 'some form of punishment or adverse regulatory action' may follow can [] chill a person

from speaking and violate the First Amendment." (quoting *Greisen*, 925 F.3d at 1114)). Even though England was not successful in removing Burch, his attempt to do so—arguing in front of the City Council that Burch should be removed with Burch present—is also arguably "reasonably likely to deter employees from engaging in constitutionally protected speech." *Coszalter*, 320 F.3d at 970; *see Greisen*, 925 F.3d at 1114 ("[R]etaliatory speech may serve as the basis for a First Amendment retaliation claim when it 'intimat[es] that some form of punishment or adverse regulatory action would follow.'" (second alteration in original) (quoting *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009))).

Second, we assume without deciding that the instances of Burch's duties being transferred and his involvement in certain decision-making being reduced constitute adverse employment actions. *See Coszalter*, 320 F.3d at 975 ("Depending on the circumstances, even minor acts of retaliation can infringe on an employee's First Amendment rights."). However, there is no genuine dispute that collectively these instances do not amount to constructive discharge.[8] Constructive discharge requires that "working conditions deteriorate, as a result of [the adverse employment action(s)], to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable

---

[8] Burch argues that the elements that made up his constructive discharge also include England's requests for Burch's resignation and England's attempt to remove Burch through the City Council. But Burch testified that neither of those were enough for Burch to resign. Instead, the record is clear that Burch resigned because of the instances of his duties being transferred and his involvement in certain decision-making being reduced. So, we consider whether *those* instances collectively constitute constructive discharge.

employee to remain on the job to earn a livelihood and to serve his or her employer." *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000)). This is a "high" bar because "federal antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable." *Id.* (citations omitted).

Here, Burch does not meet that "high" bar because his reduction in duties and decision-making did not rise to the level of "intolerable" working conditions. *Id.* First, Burch maintained 70–80% of a full-time position, continuing to attend weekly officer meetings with England, conduct weekly meetings with Public Works department heads, and manage Public Works administrative staff. While Burch may have preferred to have maintained all of his duties, "constructive discharge cannot be based upon the employee's subjective preference for one position over another." *Id.* at 1185 (citation omitted). Second, "evidence of transfer and demotion is insufficient, as a matter of law, to establish a constructive discharge," *id.* at 1184, and Burch admitted that he had no negative interactions with England at this time. Thus, "[a]s a matter of law, these are not the actions of someone who finds his working conditions so intolerable that he felt compelled to resign," meaning Burch was not constructively discharged. *Id.* at 1185.

**b**

Next, a reasonable factfinder could find that Burch's yard sign was a "substantial or motivating factor" in at least one of the adverse employment actions. *Eng*, 552 F.3d at

1070.   A public employee can establish this by demonstrating, among other things, a "proximity in time" between the protected speech and the adverse employment action(s). *Coszalter*, 320 F.3d at 977 (citation omitted). "Generally, a plaintiff need only offer 'very little' direct evidence of motivation to survive summary judgment on this element." *Ulrich*, 308 F.3d at 980 (citations omitted).

Here, a reasonable factfinder could find that the timeline of events supports a causal connection.  No more than eight months occurred between when England learned of Burch's yard sign and the occurrence of the adverse employment actions.  *See Coszalter*, 320 F.3d at 970 ("[W]hen adverse employment actions are taken between three and eight months after the plaintiffs' protected speech, a reasonable jury could infer that retaliation is a substantial or motivating factor.").  England asked for Burch's resignation days after securing re-election.  After Burch refused, England referenced Heiner as "[Burch's] candidate."  Two days later at the City Council executive session where England attempted to remove Burch, England yelled at Councilmember Evans for supporting Heiner in the election.  Immediately afterward, some of Burch's duties were transferred and Burch's involvement in certain decision-making was reduced.  Because all of this occurred in "proximity in time" to when England learned of Burch's yard sign, there remains a genuine issue as to whether the yard sign was a "substantial or motivating factor" in any of the adverse employment actions.  *Id.* at 977 (citation omitted).  However, this still does not mean that Burch has established a First Amendment violation based on that speech.

**3**

At the fourth and fifth *Pickering* steps, the burden shifts back to Appellees to show that they had "an adequate justification" for the adverse employment action(s), or alternatively, that Appellees "would have reached the same [adverse employment] decision[(s)] even in the absence of" the protected speech. *Eng*, 552 F.3d at 1071–72 (first alteration in original) (first quoting *Garcetti*, 547 U.S. at 418; and then quoting *Thomas*, 379 F.3d at 808).

First, there is no genuine dispute that Appellees met the fourth and fifth steps regarding England asking Burch to resign and subsequently attempting to remove Burch through the City Council.  England testified at his deposition that he was motivated by the Options in Process document, which he interpreted as "a department head who was telling the mayor he would do what he wanted or he would be rid of him," and which England believed "was cause for removal."   Gummersall confirmed this, and Burch acknowledged at his deposition that he believed England was motivated to ask for his resignation by both his yard sign *and* his city administrator proposal, which included the Options in Process document.  As explained above, this is unprotected speech.   There is no genuine dispute that England was justified in removing Burch based on it.  *See Eng*, 552 F.3d at 1071 ("[A] government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." (quoting *Garcetti*, 547 U.S. at 418)); *Lane v. Franks*, 573 U.S. 228, 242 (2014) ("[G]overnment employers often have legitimate 'interest[s] in the effective and efficient fulfillment of [their] responsibilities to the public,' including 'promot[ing] efficiency and integrity in

the discharge of official duties,' and 'maintain[ing] proper discipline in public service.'" (second through fourth alterations in original) (quoting *Connick v. Myers*, 461 U.S. 138, 150–51 (1983))).

Second, even assuming without deciding that the instances of Burch's duties being transferred and his involvement in certain decision-making being reduced constitute adverse employment actions,[9] there is no genuine dispute that Appellees met the fourth and fifth *Pickering* steps regarding these actions. Burch testified that there is a plausible explanation as to why the Finance Director had brought budget issues to Burch's subordinate department head instead of Burch—Burch had been trying to get Public Works department heads to have more influence over their own budgets, and he believed that speaking to the Finance Director himself would "go[] nowhere." Burch also testified that he had been performing the equivalent of approximately 2.5 full-time positions, which he complained about to England in hopes that England would either take on some duties himself or transfer them to others. England testified that he delegated the leadership training to Gummersall for this very reason. And Burch acknowledged that the transfer of planning responsibilities to the head of Economic Development and Community Services could have been the result of Appellees attempting to reduce Burch's workload to one full-time position. Burch did not raise material facts to create a genuine issue as to whether Appellees had an "adequate justification" for these actions, nor whether

---

[9] As we explained in Section IV(A)(2)(a), even assuming without deciding that individually these constitute adverse employment actions, there is no genuine dispute that collectively they do not amount to constructive discharge.

Appellees would have taken the same actions had Burch never erected his yard sign. *Eng*, 552 F.3d at 1071–72.

Because there is no genuine dispute that Appellees met their burden under the fourth and fifth *Pickering* steps, Burch's First Amendment retaliation claim fails as a matter of law.[10] *Dahlia*, 735 F.3d at 1067 n.4. The district court did not err in granting summary judgment for Appellees on this claim.

## B

Finally, we examine whether the district court properly granted summary judgment for Appellees on Burch's Idaho Protection of Public Employees Act claim. Without reaching the merits, we hold that this claim fails as a matter of law because none of the adverse employment actions occurred within the statute of limitations.

The Act requires that a suit be commenced within 180 days of the alleged adverse employment action(s). Idaho Code § 6-2105(2). Since Burch filed his complaint on August 23, 2022, the adverse employment actions that form the basis of his state claim must not have occurred more than 180 days beforehand—i.e., February 24, 2022. But there is no genuine dispute that all of the alleged adverse

---

[10] Appellees alternatively argue that Burch's speech is not protected under the "*Elrod* policymaker exception" to the First Amendment. *See Fazio v. City & County of San Francisco*, 125 F.3d 1328, 1332 (9th Cir. 1997) (citing *Elrod v. Burns*, 427 U.S. 347 (1976)). Like the district court, we do not reach this argument because Burch's claim fails as a matter of law regardless of whether he is a policymaker.

employment actions took place well before then.[11]   So, the only way that Burch's claim is not time-barred is if his March 3, 2022, notice of resignation or his April 7, 2022, letter preserved his claim that the adverse employment actions amount to constructive discharge.   But for the reasons explained in Section IV(A)(2)(a), there is no genuine dispute that Burch did not meet the high bar for showing that he was constructively discharged.   Thus, Burch's state claim is time-barred.   The district court did not err in granting summary judgment for Appellees on this claim.

## V

For the foregoing reasons, we AFFIRM the district court's order granting summary judgment for Appellees on the First Amendment retaliation claim and the Idaho Protection of Public Employees Act claim.

---

[11] While Burch argues on appeal that his "duties were being reduced on a daily basis up until his resignation," he provided no evidence for this. To the contrary, Burch stated that his duties were "pretty consistent" throughout the months of January, February, and March 2022.